### BOLAND et al. v. COMBINATION BRIDGE CO.

(District Court, N. D. Iowa, W. D. June 24, 1899.)

1. NAVIGABLE WATERS—BRIDGES—FAILURE TO OPEN DRAW FOR PASSAGE OF VESSEL.

A steamer passing down the Missouri river at 5 o'clock in the morning, on approaching a bridge, and discovering that the draw would not be opened in time for its passage, attempted to make the shore, but struck some sunken piles, and was injured, and, being unable to pass the obstruction, was carried by the current down against the draw, then partially opened, and received further injury, which caused her to sink, and she became nearly a total loss. The failure to open the draw for the passage of the boat was due to the negligence of the bridge tender employed by defendant, owner of the bridge, who had been notified of the time she would pass down, but who was not on hand. *Held*, that his negligence, for which defendant was responsible, was the cause of the injury of the vessel as well from the collision with the piling as with the bridge, it appearing that she was free from fault, and that defendant was liable for her value, less the value of such parts as might have been saved by reasonable diligence and effort after she sank.

2. SAME—STATE SUNDAY LAWS.

The fact that states on either side of a navigable river have in force statutes prohibiting the doing of certain kinds of work on Sunday does not relieve the owner of a bridge spanning the river from the duty of opening the draw on Sunday to admit the passage of vessels engaged in commerce on the river.

**3. SAME—FAULT OF VESSEL—ACTION IN EMERGENCY.**

Where the failure of a tender of a bridge across a navigable river to open the draw in time for the passage of a steamer approaching from up the stream imposed upon those in charge of the vessel the necessity of hasty action to prevent a collision with the bridge, an error of judgment on their part, committed in the haste and confusion incident to the situation, will not be imputed to the vessel as a fault.

This was a libel in admiralty by the owners of the steamer Benton against the Combination Bridge Company to recover for the loss of the boat. Heard on pleadings and proof.

Henderson, Hurd, Lenehan & Kiesel and Strong & Owens, for libelants.

Taylor & Burgess, for respondent.

SHIRAS, District Judge. The Combination Bridge Company, the respondent herein, is a corporation created under the laws of the state of Iowa, and is the owner of a combined railroad and wagon bridge across the Missouri river at Sioux City, Iowa, which bridge was erected under the provisions of the act of congress approved March 2, 1889 (25 Stat. 849) and the act amendatory thereof, approved April 30, 1890 (26 Stat. 79). On the evening of July 17, 1897, the steamer Benton, which was then employed in the freight and passenger business upon the Missouri river, passed through the draw of the bridge on its way to the Big Sioux river, which enters the Missouri some four miles above the bridge, and the captain of the steamer notified the bridge tender, James Walsh, that the boat would return down the river, and pass the draw, at 5 o'clock, or thereabouts, the next morning, to wit, Sunday, July 18th. The draw was turned by hand power, and Walsh, the bridge tender, who testifies that he was in charge of the draw in July, 1897, also testifies that it required eight men to properly operate the sweeps, two in number, with which the draw was turned. The evidence further shows that the bridge company did not keep a force of men on the bridge at all times to aid in manipulating the draw; that there were but few passages made by boats through the draw, and that it was the practice of the company to call on men living in the neighborhood of the bridge for aid when it was necessary to open the draw; that on the evening of July 17th Walsh notified a number of these men that the draw was to be opened the next morning at 5 o'clock, and in pursuance of this notice these men were at the draw at about the time named. The evidence further shows that the steamer left the landing in the Big Sioux river on the morning of the 18th, reaching the Missouri at 5 minutes past 5, and at 10 minutes past 5 the proper signal for the opening of the draw was given by the steam whistle on the boat, and was repeated at short intervals as the boat came down the river, the signals being heard by the men who were to open the draw. The Benton continued on its way towards the bridge until it reached a point about 1,200 feet from the draw, and, the draw not being then open so as to admit the passage of the steamer,

the captain attempted to make the shore on the Nebraska side of the river, but in approaching the same the boat struck upon some submerged piles in the river, knocking a hole in the hull. The effort to land proved futile, and the steamer was swept down by the current into the draw, which by that time had been partly opened, and the pressure of the boat forced the draw open, so that the steamer passed through, and it was finally landed on the Iowa shore, near the foot of Jackson street, in Sioux City, where it finally sunk, and became practically a total wreck and loss. The evidence further shows that the reason why the draw was not opened more promptly was due to the failure of the bridge tender, Walsh, to reach the draw, and direct its opening, in accordance with the notice he had received the evening previous. The evidence shows that when the men who had been notified by Walsh to be in attendance saw the boat coming down towards the bridge, they did not undertake to open the draw. They evidently acted in the belief that they had no authority in the premises in the absence of Walsh. When they found that Walsh was not present, they sent at least two messengers to hunt him up, and notify him that the boat was coming, but they did not attempt to open the draw until they had received a signal to that effect from Walsh, who testifies that he gave the signal by waiving his hand, and calling out to them, as he was coming towards the draw; and in obedience to this signal the men began to open the draw about 20 minutes past 5. There can be but one conclusion drawn from the evidence on this point, and that is that the failure to open the draw more promptly was due to the negligence of Walsh in not being at the draw in proper season. The duty of the bridge company was to open the draw with all reasonable promptness for the passage of the Benton on the downward trip, and, as it is not questioned that the bridge company had been notified through its agent, the bridge tender, that the Benton proposed to pass the draw at about 5 o'clock, it was the duty of the company to use ordinary care to have the draw open when the boat came down the river in pursuance of the notice given the evening before. The evidence shows that it requires about 10 minutes to open the draw, and yet with this knowledge Walsh did not come to the draw until fully 20 minutes after 5, and, under the circumstances developed in the evidence, it must be held that Walsh was clearly negligent in the performance of the duty imposed upon him, and his negligence in this particular is chargeable to the bridge company.

It is urged in argument on behalf of the bridge company that, as this accident happened on a Sunday, there was no obligation resting upon the company to open the draw on that day, and therefore the company cannot be held liable for the failure in this particular, and in support of this proposition counsel cite the provisions of the statutes of the states of Iowa and Nebraska forbidding the doing of certain kinds of labor on that day; but both of these statutes contain the proviso that nothing therein contained shall be construed to prevent persons traveling or families emigrating

from pursuing their journey, or keepers of toll bridges, toll gates, and ferrymen from attending to the same, and it would seem, therefore, that attendance upon this bridge would come within the exception to the statute, even if it should be held that these statutes are applicable to bridges across the navigable rivers of the country such as the Mississippi, the Missouri, and the like, which, as avenues and means of commerce between the states, are under the control of the national government. It would certainly be a novel proposition to hold that steamboats upon these great rivers, engaged in the transportation of passengers and freight thereon, cannot pass the bridges now spanning the same on Sunday, because the so-called Sunday laws of the states forbid the manual labor necessary to open the draw.

It is further urged on behalf of the respondent company that the injury to the boat was caused by its striking upon the submerged piling in the attempt to make a landing, and for the injury caused by the collision with the piling the bridge company is not responsible. The evidence shows that part of the injury to the boat was the result of the collision with the piling, and part was caused by the boat striking the bridge when it was forced through the draw, but these successive injuries resulted from one and the same cause, to wit, the failure to promptly open the draw upon the approach of the boat, which failure was due to the negligence of the person to whom the bridge company had intrusted the duty of controlling the opening of the draw. It was the failure on part of the company to have the draw opened that created the necessity for making a landing, and the collision with the piling has the same causal connection with the negligence of the company as has the collision with the bridge when the boat was forced through the draw; and, if the company is liable for the injuries resulting from the latter collision, it must be equally liable for the injury resulting from the collision with the piling. Thus it is well settled that if one vessel negligently runs against another that is moored to a dock or wharf, and thereby breaks the fastenings of the latter, thus setting it adrift, and it is carried by force of the current against the shore, or against some obstruction in the river or harbor, and by collision therewith is caused to sink, the colliding vessel is liable not only for the injury caused by the actual collision between the two vessels, but also for that resulting from the striking against the shore or other obstruction; and this rule is applied in cases wherein there was no collision between the vessels, as in the case of The Leo, 15 Fed. Cas. 325, wherein a propeller, while at a pier, created such a swell in the water that it broke the fastenings of a canal boat, which then collided with a bulkhead, causing it to sink, and the propeller was held liable for the loss of the canal boat. So, in The C. H. Northam, 5 Fed. Cas. 644, a steamer was held liable for the damage to a canal boat forming part of a tow in charge of a tug, which resulted from the suction and swell caused by the rapid movement of the steamer in close proximity to the tow, whereby the canal boats were dashed

against each other. If the draw had been opened in due season, the Benton would undoubtedly have safely passed the bridge, but through the negligence of the respondent the boat was compelled to make the attempt to reach the shore, and the bridge company must be held responsible for the risks involved in so doing. Having, by negligence on its part, created the necessity for making a landing on part of the boat, it cannot escape liability for the injuries caused to the Benton in the effort to reach the shore, on the theory that there was no causal connection between the act of negligence, to wit, the failure to open the draw, and the striking of the submerged piles by the boat in the effort to reach the shore.

It is further contended on behalf of the bridge company that, admitting it to be shown that there was negligence on its part in that the draw was not promptly opened, nevertheless the parties in charge of the Benton were also negligent in that they approached so near to the bridge before attempting to make a landing, it being apparent to them that the draw was not open. There can be no question of the fact that it was the duty of the parties in charge of the Benton to use all due care in the management of the boat when approaching the bridge, and the contention of the respondent is that as the boat came down the river, and for a distance of at least two miles, the bridge was in plain sight, so that the parties in charge knew that the draw was not open, and with that knowledge they should have stopped the boat at a safe distance from the bridge, and that the failure so to do constituted negligence on their part, contributing to the accident. The evidence shows that the boat was moving at a moderate rate of speed, and the parties in charge saw the men at the draw; and, in view of the notice given to the bridge company the previous night of the need of having the draw open, was it not a reasonable supposition on their part that the men in charge would commence to open the draw in time for the passage of the boat, and therefore can it be said that the Benton was in fault because those in charge of the steamer brought it within 1,200 feet of the bridge before attempting to stop its progress? It is clear from the evidence that, had it not been for the submerged piles in the river, the boat would have safely reached the shore, so that the facts do not present the question that would have arisen had the boat been allowed to come so close to the bridge that, when the parties in charge attempted to arrest its course, it could not be done, and the boat collided with the bridge. The evidence justifies the conclusion that the boat could have been safely landed had it not been for striking against the hidden piles, and therefore the fact that the landing was not attempted until the boat was within 1,200 feet of the bridge does not prove want of due care on part of the Benton. The evidence shows that both the captain and pilot of the Benton knew that there were sunken obstructions above the bridge, and in the neighborhood of the place where the attempt to land the boat was made, but it is not shown that they knew the exact location of these obstructions, and, taking the entire facts into consideration, it cannot be said that the parties in charge of the steamer were negligent in attempting to make a landing where it was attempted.

If, through the fault of the bridge company, a sudden necessity was imposed upon the Benton to make a landing to avoid being swept against the bridge, and in making the landing the boat had been swept against the shore itself, and had been injured, it would not be open to the bridge company to escape liability by claiming that the Benton could see the shore, and ought not to have approached it. The rule is well settled that, where the negligence of one party imposes risk and danger upon another, an error of judgment, committed in the haste and confusion incident to the situation, will not be imputed as a fault to the party thus compelled to act without time for careful investigation of his surroundings. Thus, in the case of The Belle, 3 Fed. Cas. 127, it was said:

"The movement was made in a moment of alarm and of imminent and overwhelming peril, peril into which the vessel had been brought by the fault of the Belle, and by no fault of the Tempest. The error of a vessel thus brought into immediate jeopardy by the fault of another, committed in a moment of alarm, will not subject her to damages, nor prevent her recovery. This is a perfectly familiar principle of constant application by courts of admiralty."

In the case of The Favorita, 8 Fed. Cas. 1099, the rule was stated as follows:

"The pilot was acting in good faith, in a situation of great peril; and an opinion formed after the event, which should pronounce his judgment erroneous, ought not to be decisive of fault on his part, casting the loss upon the libelants. It is a familiar and well-settled rule that when a vessel is placed in imminent jeopardy by the fault of another the discretion which her mariners are called upon instantly, and in the very jaws of the peril, to exercise to effect deliverance, is not to be closely criticised, nor their conduct to be condemned, unless very plainly negligent or unskillful. Sudden danger and unavoidable alarm in a degree disqualify for the exercise of that calm weighing of chances and a deliberate choice of the best possible mode of escape which may, under other circumstances, be required."

After the event has occurred, it is an easy matter for witnesses to point out that the accident might have been prevented by slight changes in the action of the parties in charge of the Benton, but that is not the final test which determines the question of negligence on their part. Wisdom that comes from the contemplation of an event after it has happened is of easy acquirement, but it cannot be made the test for determining whether there was or not a lack of care on part of the actors, preceding the occurrence of the event. When it became apparent to the officers of the Benton that the draw was not to be opened, and that immediate action must be taken to prevent the boat from striking the bridge, there was not time nor opportunity for making an examination of the shore for hidden obstructions, nor for selecting a certainly safe place to make a landing. The pressing necessity was to get the Benton to the shore, and the risks inhering in the situation should not be cast on the Benton, but upon the bridge company, by whose negligence the necessity for making the landing was created. Upon this branch of the case the conclusion must be that it is not made clear that there was negligence on part of the Benton, and therefore it is not a case for a division of the

damages, but the whole liability must be adjudged against the bridge company.

In discussing the amount of the damages to be awarded, counsel for the bridge company earnestly contend that after the Benton passed through the draw the parties in charge should have taken the boat to a point where the water was shallow, so that, even if the boat did sink, it could have been raised and repaired, thus preventing a total loss; and that this could have been done either by the power of the Benton, in its disabled condition, or by procuring the services of another steamer. The evidence shows that the Benton, after passing the bridge, was badly disabled, and does not support the conclusion that the boat could have been landed or taken by its own machinery to any other point than the one to which the current swept the boat after passing the draw; nor does the evidence make it certain, or even probable, that the Benton could have been towed by any other steamer to a safer landing. It was, of course, the duty of those in charge of the Benton to do all that was reasonably in their power to keep the boat from sinking, or, if that could not be prevented, to save as much as possible of the machinery and appurtenances, but the evidence justifies the conclusion that the sinking of the boat is not to be attributed to any lack of care on part of the officers of the boat, and therefore the respondent must be held liable for the fair value of the Benton, deducting therefrom such sum as fairly represents the value of what might have been saved by the exercise of proper care on part of those in charge of the boat. Upon the question of the actual value of the Benton, the witnesses are widely apart in their estimates. In the libel the value is placed at $8,000, and the witnesses on behalf of the libelants place the value at from $8,000 to $10,000, whereas the witnesses for the respondent put their estimate at from $1,000 to $3,000, thus making the fair average of these estimates about $6,000. The evidence shows that the Benton was built in 1875, and by repairs to the hull and machinery had been kept in good condition. T. B. Sims, one of the libelants, bought the boat at marshal's sale in the spring of 1896 for the sum of $1,450, having instructed his agent, through whom he made the purchase, to bid as high as $3,000 for the boat. In the spring of 1897, he sold one-half of the boat to his co-libelant, James P. Boland, for the sum of $1,500. After the boat had been taken to Sioux City, Boland offered on behalf of Capt. Sims to sell his interest at the rate of $2,500 to $3,000 for the half interest, which would make a total value of from $5,000 to $6,000. Taking into consideration the entire evidence on the question of the value of the boat, it fairly justifies the conclusion that the actual value of the Benton at the time of the accident would not exceed $6,000. The evidence further shows that, after the boat was landed at the foot of Jackson street, the larger part of the machinery and appurtenances of the boat could have been removed, and Capt. Boland was making progress in that direction when a writ of attachment was served on the boat by the sheriff of Woodbury county to secure payment of a bill for coal, due from the boat, and when this was done no further effort was

made to save the machinery, and the boat became practically a total loss. The respondent is nowise responsible for the cessation of the work of salvage following the service of the writ of attachment, and it is clear that with proper effort on part of Capt. Boland, the work of saving the machinery could have been proceeded with notwithstanding the service of the attachment; and the evidence tends strongly to show that with proper effort the larger part of the machinery on the boat could have been saved, and to an amount that would probably have netted the sum of $1,500 over and above the expense of salvage. Deducting this sum from the value of the boat, leaves a difference of $4,500 as the amount of the damages to which the libelants are entitled, and a decree in their favor for that amount and costs will therefore be entered against the respondent.