O'KEEFE et al. v. STAPLES COAL CO.

(District Court, D. Massachusetts. September 6, 1911.)

No. 261.

1. PLEADING (§ 17*)—ANSWER—ARGUMENTATIVENESS.

Statements in answers in a suit in admiralty *held* improper, and subject to exception on the ground that they were argument only.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 38, 41, 195, 350; Dec. Dig. § 17.*]

2. ADMIRALTY (§ 61*)—PLEADING—ANSWER.

An answer to a petition filed by respondent in an admiralty suit under admiralty rule 59 (29 Sup. Ct. xlvi) must either admit or deny all ma-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

terial allegations of the petition, unless it is stated that the answering respondents are ignorant as to the truth of such allegations.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 497–506; Dec. Dig. § 61.*]

**3.** NAVIGABLE WATERS (§ 20*)—INJURY TO VESSEL BY COLLISION WITH BRIDGE —LIABILITY OF COUNTY.

A schooner had her masts carried away by striking a drawbridge maintained by the county while being towed through it before daylight, the draw not having been opened, although, as shown by a preponderance of the evidence, the tug sounded reasonable signals with her whistle when approaching. It also fairly appeared that she could not have safely turned or stopped with her tow after approaching nearer than 600 feet, and that on previous occasions the draw had been opened when she was less than such distance away. *Held*, that she was not in fault, but that the injury was due solely to the negligence of the bridge tenders employed by the county in failing to open the bridge in response to the signals, as required by Act March 23, 1906, c. 1130, § 4, 34 Stat. 85 (U. S. Comp. St. Supp. 1911, p. 1556), for which negligence the county was liable.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 73–99; Dec. Dig. § 20.*]

In Admiralty. Suit by John S. O'Keefe and others, owners of the schooner Sarah L. Thompson, against the Staples Coal Company, owner of the tug Cohannet; the County of Bristol, Mass., being impleaded. Decree for libelants against the county.

See, also, 201 Fed. 131, 144.

D. Gardner O'Keefe, of Taunton, Mass., and Fitz Henry Smith, Jr., of Boston, Mass., for libelants.

Richard P. Borden, of Fall River, Mass., for Staples Coal Co.

Frederick S. Hall, of Taunton, Mass., and Albert P. Worthen, of Boston, Mass., for Bristol county and county commissioners.

DODGE, District Judge. In an opinion filed December 1, 1910 (201 Fed. 131), overruling exceptions to the libel filed by the county of Bristol and its commissioners, the nature of this case has been stated and its history reviewed up to that point. Since the exceptions were overruled as above, there have been two amendments to the libel, on January 10 and January 30, 1911, neither requiring special notice here. On April 15, 1911, the Staples Coal Company filed exceptions to the answers which had been filed to its petition, on June 11, 1910, by the county of Bristol and by Messrs. Bryant, Chase, and Warner, county commissioners. The case has also been heard on the merits, without requiring the court first to make an express decision on the sufficiency of the answers, where attacked by the exceptions.

There are 12 exceptions to each answer. The first objects that the third article of each denies the facts and circumstances of the collision to be correctly stated in the petition "as to some particulars," without specifying the particulars. Of course, some specification was necessary. But the answers elsewhere purport to give the respondents' own account of the facts and circumstances, particularly in the articles numbered 8. Although the answers nowhere so state, I think I may take them as meaning to deny the correctness of the statement

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

in the petition, where it disagrees with the statement contained in the answers.

[1] The seventh exception objects to the statements in the fourth article of each answer that, if the tug's helm was in fact ported, she did not respond, and her subsequent course and speed forbade the supposition that her helm had been ported. This seems to me neither admission nor denial, nor new matter set up in defense, but argument only, and improper in an answer. The eighth exception objects to denials, in the same article of each answer, that the tide, at the time, was such as to put the tug in danger of being carried broadside to the bridge, forcibly enough to endanger her or those on board, if her helm had been seasonably ported. This I consider improper for similar reasons.

The twelfth exception objects to denials in the seventh article of each answer that the county accepted and undertook the control of the bridge, or employed and paid those who opened or controlled it, "in such legal effect as to constitute liability," or "personal liability." This seems to me objectionable on similar grounds.

[2] The eight exceptions remaining relate to portions of the fourth and fifth articles of each answer, wherein the respondents neither admit nor deny certain allegations of the petition, and leave the petitioner to make such proof of the same as may be material. It is nowhere stated that the respondents are ignorant as to the truth of the allegations thus treated, and as to some of them the facts raise a presumption that they were not ignorant. Unless really ignorant, they were bound either to admit or deny. I am unable to regard the portions of the answers covered by these eight exceptions as sufficient.

[3] Inasmuch as all the evidence which any party has desired to introduce has now been heard, I shall proceed to deal with the case as if the respondents had denied what they have thus left the petitioners to prove, if material, without alleging their own ignorance as to its truth. The evidence leaves no doubt that on Saturday, December 11, 1909, at a little before 5 o'clock in the morning, the schooner Sarah L. Thompson, owned by the libelant J. Howard O'Keefe and the other libelants whose names are set forth in the amendment to the libel, filed January 30, 1911, was being towed by the tug Cohannet, owned by the Staples Coal Company, from an anchorage in Mt. Hope Bay, near the mouth of the Taunton river, up said river toward Taunton, whither she was bound with a cargo of clay, laden on board her at Perth Amboy, N. J., for delivery at Taunton. On her way toward her destination she had to pass first through the draw of the Slade's Ferry bridge and next through the draw of the Brightman Street bridge, both of which bridges cross said river at Fall River, the latter draw some 1,220 feet above the former. The draw of the Slade's Ferry bridge was duly opened for their passage. They continued toward the draw of the Brightman Street bridge, expecting it also to be opened before they got to it. It was not opened. The tug passed underneath it, losing only her flagstaff by collision with it. The schooner also passed underneath it, but in doing so had her masts and spars broken or carried away and sustained other damage. For the purposes of the ques-

tions raised regarding the responsibility for this disaster, the three opposing parties now before the court may be referred to as the "tug," the "schooner," and the "county." Each denies that the damage to the schooner was due to any negligence attributable to it. The schooner contends that it was due to negligence on the part of the tug, or the county, or both; the tug and the county each contend that it was due to the negligence of the other, but neither charges the schooner with any fault.

The Brightman Street bridge, where the accident happened, since it crossed navigable waters of the United States and was erected under authority granted by Congress, was subject to the provisions of the federal statute enacted March 23, 1906 (34 Stats. 85, c. 1130 [U. S. Comp. St. Supp. 1911, p. 1556]). Section 4 of this statute requires the draw of such a bridge to be "opened promptly, * * * upon reasonable signal, for the passage of boats and other water craft." The evidence sufficiently shows the bridge with its draw to have been at the time under the county's control, and the county to have been undertaking to perform the duties imposed by the statute. Here were two vessels desiring passage through the draw, and the draw was not opened. If it appears that "reasonable signal" for its opening was given, it is for the county to explain the failure to open.

Upon the tug, as part of her undertaking to get the schooner safely up river, the schooner having no duty save that of properly following the tug, lay the duty of signaling for the opening of the draw. Sound signals were the kind of signals required, because it was not yet daylight. The tug claims to have given six signals in all within hearing distance of the draw, each consisting of three long whistle blasts, three such signals before and three after passing through the Slade's Ferry draw, as follows: The first when from one-fourth to one-half a mile below the latter draw; the second when somewhat nearer to it, after which it was opened; the third while passing through it; the fourth immediately after passing through; the fifth when about half way from it to the Brightman Street draw; and the sixth just before the tug went underneath that draw. The tug's master, who was steering her in her pilot house, testifies that he himself sounded all these signals.

The tug's crew consisted of an acting mate (Angell) on her forward deck at the time, the engineer (Braley) in her engine room, which was on her main deck and had windows through which he could see where the tug was, and the fireman (Reed) most of the time in the fire room below deck. The acting mate and engineer confirm the captain's statement as to all six of the signals which he says he sounded. The fireman says that while working below he paid little attention, but noticed that "she blowed two or three different times." Two witnesses called by the tug, apparently without interest in the case, also confirm the captain's statement. One of them (Kirby) was foreman of the Slade's Ferry draw, the other was one of the draw tenders there (Brown), and both were on duty there at the time. Two other witnesses were called by the tug, also apparently disinterested. One of them (Whittaker), a foreman employed by the street railway and at the time about a mile and a half away from the draw, says he heard the tug-

boat's whistle blown so frequently as to make him notice and remember the fact. The other (Thibault) was a trackman employed by the street railway. He happened to be on the westerly end of the Slade's Ferry Bridge, about 300 feet from the draw in that bridge. He saw the tug passing through the draw, and heard her sound the last three signals to which the captain testified, but says nothing about the first three.

The schooner (86 feet long) was being towed astern of the tug (83 feet long), with 100 feet, or a little more, of hawser between them. Her master, with two other men, composed her crew; all three being on deck at the time. The master (O'Keefe) and one of the crew (McManus, cook and deckhand) were witnesses on her behalf. Captain O'Keefe says that the tug sounded the first three signals described by her master, but that he heard no signals sounded after the one given upon clearing the Slade's Ferry draw until the tug got to the Brightman Street draw and was going under it. Then, as he says:

"I could not say what he blowed, or anything about it. I know he was blowing, because when I see he was going into that bridge I was pretty timid."

McManus' testimony was:

"He blew three short blasts for the Slade's Ferry bridge. * * * Going through the draw of the Slade's Ferry bridge, he blew three more short blasts for the Brightman Street bridge."

He says there were no signals blown between the two bridges.

A watchman employed at the People's Coal Company's yard on the east bank of the river, between the two bridges, also a witness apparently without interest, called by the schooner (Smith), stated that he was in the office at the yard, heard a signal of three blasts, left the office, and went down to the dock, some 75 feet away. From the end of the dock he saw the tow going through the Slade's Ferry draw. He watched it until the accident. He heard no other whistle signal, except the one heard by him in the office. This witness appeared to be somewhat hard of hearing.

In charge of the Brightman Street draw at the time, was Sullivan, a drawtender, called as a witness by the schooner, and Menchion, an electrician, called by the county. According to their testimony, Sullivan's duties were to close the gates across the bridge west of the draw when the draw was to be opened, Menchion's to close the gates on the east side and then start the electrical machinery which moved the draw. Their hours of duty were from 11 p. m. to 7 a. m. Both were in the operating house on the north side of the bridge, near the easterly end of the draw, in which house there was a stove. Both were sitting down, Sullivan reading. Door and windows were shut, the weather being cold. Sullivan, looking out of the window, saw smoke or steam below the the bridge, said to Menchion, "There is a tow between the draws," ran out of the house, and shut the gates west of the draw. When he first saw the schooner, she was half way between the draws. After he got the gates closed, he heard the tug sound three strong blasts when she went under the bridge. Menchion also came out of the house, whether before or after Sullivan, saw the tug, went to the

gates east of the draw, and got one of them closed before the tug went under the bridge. The draw had not been moved when the schooner struck. Menchion heard no whistles from the tug, as did Sullivan, when she went under the bridge.

Some time before they thus left the house to close the gates, both men had heard what they then thought might be a tug's whistle. It was a signal of three blasts according to Sullivan, of one blast according to Menchion. They decided that it came from the New York boat, whose wharf is below the Slade's Ferry bridge, did not leave the house, and paid no further attention to the signal. According to Sullivan, this happened 20 or 25 minutes before they were aroused by seeing the tug's smoke or steam. According to Menchion, it was about 15 minutes before the accident. The New York boat's usual signal is three blasts, a signal sometimes repeated, but not always.

I must hold, on this evidence, that the tug has sustained the burden of showing that she gave reasonable signal for the opening of the draw. I should be much inclined to hold that signals given for the opening of the Slade's Ferry draw before entering it were reasonable signals for the opening of a draw only about 1,200 feet further on. It is true that there are two wharves between the bridges, where vessels sometimes stop; but signals for up-river passage, sounded below the Slade's Ferry draw, must be hardly less audible at the Brightman Street draw, and ought, at least, to put those in charge of that draw on the alert to know as soon as possible whether its prompt opening will not also be required. But, in any case, one signal sounded in or while clearing the Slade's Ferry draw would be, in my opinion, a reasonable signal, sufficient to require the prompt opening of the draw above. That such a signal, at least, was given, seems to me clearly proved. The evidence leaves no doubt in my mind that the tug did in fact sound three signals after going into the Slade's Ferry draw. The evidence further satisfies me that inattention and neglect on the part of Sullivan and Menchion was the sole reason why the signals given were disregarded. The county, therefore, whose servants they were, is in any case responsible for the failure to open the draw promptly as the statute requires. It is liable for all the damage to the schooner, if this failure was the sole cause of the accident, and for half of the damage if fault on the tug's part contributed.

The schooner or the county have undertaken in the pleadings to charge the tug with fault in the following respects: That her captain was incompetent, that the tug went too fast between the draws, that she did not slow down before getting to the Brightman Street draw, that she did not turn and swing the schooner clear of the bridge on finding the draw still closed, and that she did not slow down, lie by, or wait for the draw to open before going under the bridge.

The tug's captain had had 26 years' experience at sea, had been a licensed pilot since 1889, and a licensed master of steam vessels since 1890. During his experience since 1890, he had averaged four or five trips each week up and down the Taunton river as master of a tugboat with some other vessel in tow, passing on those trips

through the draws of the bridges across the river. The Brightman Street draw had been one of the draws through which he had to pass since October, 1908, when that bridge was opened, some 14 months before this accident. He was 42 years old, and testified as a witness in the case. Whether or not he made any mistake in connection with this accident, there is no evidence on which I can find him incompetent, generally speaking.

As to his speed between the bridges, the following facts appear: It is necessary, in taking a vessel up the Taunton river, to go up with the tide. The tide at the time was about half flood, running up the river at a rate of about 1½ miles per hour as estimated by the captain of the schooner, and between 2 and 3 miles as estimated by the captain of the tug. The evidence affords no means more reliable than estimates for ascertaining the true rate. The tug's engine, which, according to her evidence, had previously been running, ever since taking the schooner in tow, under one bell, the signal for half speed, was slowed down somewhat, under order through the speaking tube from the captain to the engineer, when she entered the Slade's Ferry draw. She thereafter kept on, without stopping, under this reduced half speed, until the accident. Without keeping some strain on the towing hawsers, she would not have been in control of her tow for want of steerage way. Some speed through the water was therefore necessary. There was a slight change of course to be made in coming out of one draw and into the other. According to the schooner's captain, the rate of speed from one bridge to the other was about 6 miles an hour; according to the acting mate of the tug, about 4 miles through the water. The tug's engineer and fireman state that her engine was going as slowly as it could without stopping. Statements are in evidence that she was going "pretty lively," or "at a good pace," or "clipping it right along." There is evidence that she was going faster than usual through the bridges, and that she was going slower than usual. Unless she was called upon to anticipate, while going through the Slade's Ferry draw, that the Brightman Street draw would not be open when she got to it, I find no reason to believe her speed greater than was proper, in view of the necessity for keeping steerage way. I do not believe her actual speed exceeded 6 knots, and think it may well have been considerably less. At 6 knots it would take her 2 minutes between the 2 draws, and at 5 knots about 2¾ minutes. The actual lifting of the draw from a state of rest has been found to take 36 seconds, according to the evidence of Merritt, electrician in charge. This does not include closing the gates, which according to Menchion's estimate takes 45 seconds more, making the time required for the whole operation less than a minute and a half. Except in daylight, an observer at the Slade's Ferry draw could not tell whether the gates were being closed or not. Lights on the draw show red until it begins to lift, when they change to green, and this would be the first visible signal that the opening had begun.

With the schooner and the tide behind her, I do not think the tug could safely have slowed down between the draws. As to the

claim that she ought to have turned and swung the schooner clear of the bridge upon finding that the draw did not open, I think the evidence shows that there was available water between the draws sufficient to permit the tug to make such a turn with the schooner so far as the room necessary for the operation was concerned, and that, under favorable circumstances, such a turn might have been made,. even if not begun until the tug had got half way to the Brightman Street draw. But, carried along as both vessels were by the tide, I do not think it is shown that such a turn could safely have been made later. Close to the draw, at a distance estimated by him at 125 to 150 feet, because of its continued failure to open, the tug's captain ported his wheel with the idea of attempting to turn; but apprehended danger of increased damage to both vessels caused him to steady the wheel again immediately and go under the draw as the least of two evils.

If such a turn was to be made, steerage way amply sufficient for full control was indispensable, so that the claim that the tug ought to have turned between the draws is inconsistent with the claim that she ought to have slowed down. The total distance from the tug's bow to the schooner's stern cannot have been much less than 300 feet. Allowing for sufficient speed through the water to insure control both of the tug and tow and for the tide, I am unable to believe that less than twice this distance, or about half the distance between the draws, could have afforded sufficient margin for safety.

As to the claim that the tug should have "lain by or waited" until the draw was opened, it is obvious from what has been said that nothing of the kind could safely be done after the schooner had once got away from the pier adjoining the Slade's Ferry draw on its northerly side. To this pier she might have been made fast; but, once away from it, I see nothing that the tug could have done, if obliged to avoid the bridge ahead, but to turn with the schooner and to turn in time.

If, then, the tug was bound to anticipate, before getting the schooner away from the pier referred to, that the Brightman Street draw would not be open for passage when she got to it, she would be in fault for not having stopped, instead of proceeding further. If she was not then bound to anticipate such failure to open the draw, but became bound to anticipate it before she had proceeded more than half way to the next draw, she would be in fault for not turning while it was still safe to turn. But if not bound to anticipate any failure to open until after she was more than half way to the draw, I do not see how she can be held in fault at all. Even if, after the event, it could be said that there was a possibility of turning safely within 600 feet of the draw, a wrong decision on the tug's part between two such alternatives, in an emergency created wholly by fault on the county's part, would not be contributing fault on the part of the tug, according to the rule, familiar in collision cases, regarding error in extremis— a rule the more applicable here in view of the fact that the evidence leaves it at least doubtful whether turning within that distance would be safe or not. The Elizabeth Jones, 112 U. S. 514, 526, 5 Sup. Ct. 468, 28 L. Ed. 812; The City of New York, 147 U. S. 72, 85, 13 Sup.

Ct. 211, 37 L. Ed. 84; The Ludvig Holberg, 157 U. S. 60, 71, 15 Sup. Ct. 477, 39 L. Ed. 620; The Oregon, 158 U. S. 186, 204, 15 Sup. Ct. 804, 39 L. Ed. 943; Boland v. Bridge Co. (D. C.) 94 Fed. 888.

The evidence fails to satisfy me that the tug had become bound to anticipate failure to open the draw and to take measures accordingly at any time before she had proceeded half way toward it. I must deal with this question upon the assumption that, as I have found, reasonable signal for opening the draw had at that time been given at least twice after the tug had entered the Slade's Ferry draw. Although the lights at the Brightman Street draw showed it to be closed when the tug and schooner passed the Slade's Ferry draw, and continued so to indicate up to the time of the accident, the tug had the right to assume that drawtenders were in charge of it, having nothing to do but watch for such signals and respond promptly to them. In the absence of any signal of warning or caution from them, the longer opening was delayed, the more reason to expect the delay to end. It does not appear that there had been any previous failure to open the draw in time. That the opening had not infrequently been delayed on previous occasions until the tug had got considerably nearer this draw than half the distance between it and the other I am unable to doubt. The men on the tug so testified, and I find no contradiction, except such as comes from the drawtenders whose inattention to signals was the only reason why its opening was being delayed on this occasion. Under such circumstances, the absence of any emergency warning that the draw would not open in time amounted to an invitation to the tug to proceed. Manistee, etc., Co. v. Chicago (D. C.) 44 Fed. 87; Chicago v. Mullen et al., 116 Fed. 292, 54 C. C. A. 94; Clement v. Metropolitan, etc., Co., 123 Fed. 271, 59 C. C. A. 289.

The schooner's captain testifies that, while passing through the Slade's Ferry draw, some man, not identified, on that bridge told or sung out to the captain of the tug "that the bridge was closed," and repeated the statement to the schooner as she followed through the draw. McManus, the other witness from the schooner, also on her deck at the time, does not testify to hearing anything of this kind, nor does either of the Slade's Ferry drawtenders on duty confirm the statement, though each says that he called out to the tug or schooner that he saw no stir or sign of life at the draw above. The tug's captain and mate say they heard nothing about the other draw from any one at the Slade's Ferry bridge. I do not think that such calls, if heard, would add anything to the circumstances requiring the tug to anticipate failure to open. No reason appears for supposing any one at the Slade's Ferry draw better informed about what the drawtenders at the other bridge were doing than the people on the tug. All knew that the other draw was still closed, and none of them knew or could have known why at the time. It appears that the electrical machinery which lifted the other draw made a noise when thrown into operation, audible at the Slade's Ferry draw, for a brief interval before the draw actually lifted. Men whose time was spent

at the Slade's Ferry bridge may have learned to regard this noise as an indication when the draw was about to lift; but I am not satisfied that the master of a tug like this, though making frequent trips up and down through these draws, would have been likely, or could be required, to take notice of it or govern himself by it. The tug's captain had been on the Brightman Street draw since it had been in operation, had talked with the drawtenders, had gained some knowledge of its mode of operation, and knew, as did 'everybody, that no regular signal was used to warn that opening of the draw could not be expected. Nothing, however, that thus appears, seems to me to put upon him any greater duty to anticipate this failure to open the draw. Properly vigilant drawtenders, though there was no regular signal for the purpose, would, as I cannot doubt, have found some way of making the fact known in time to the tug, had they encountered any unexpected difficulty in operating the draw.

In view of the nature of the duty incumbent on the county to have the draw open in time on this occasion, and in view of the nature of the failure to perform it, I am unable to find that contributing fault on the tug's part has been sufficiently proved.

There must be an interlocutory decree for the libelants against the county of Bristol. As against the tug, the libel must be dismissed. The circumstances of the case seem to require, however, that no final decree thus dismissing the libel should be entered until after the amount of damages recoverable from the county has been ascertained, so that the result reached as above can then be carried out by one final decree disposing of the entire case.