## GEORGIA–ALABAMA COTTON CO. et al. v. WARRIOR PACKET LINE et al.

District Court, S. D. Alabama, S. D.
July 24, 1934.

Harry T. Smith & Caffey, of Mobile, Ala., for Georgia-Alabama Cotton Co.

Pillans, Cowley & Gresham, of Mobile, Ala., and Ed Pettus, of Selma, Ala., for Warrior Packet Line.

Smith & Johnston, of Mobile, Ala., for Southern Ry. Co.

ERVIN, District Judge.

In this case libelants delivered to the Warrior Packet Line, as a contract carrier, certain bales of cotton to be shipped to Mobile, order notify. Some of the cotton was loaded by the Packet Company on the steel barge No. 36 and some was loaded on the wooden barge No. 28.

There is a contention by the libelants that the Packet Company agreed to load this cotton on the steel barge No. 36, but for the purpose of this case I do not deem it necessary to pass on this question.

The two barges were then put in tow of the Mamie–D, a towboat. No. 36 was lashed in front of the Mamie–D, and being a wider boat, extended several feet on each side of the Mamie–D. Barge 28 was lashed on the port side of No. 36, with its starboard bow about midships of the port side of No. 36 and lashed close to the side of No. 36 so that its stern projected approximately one-third beyond the stern of No. 36, leaving a space of some three or four feet between its rear starboard side and the port side of the Mamie–D, its starboard stern being lashed to the port side of the Mamie–D. In this way the flotilla proceeded down the river.

The river was at flood stage. The testimony of different witnesses showed the gauge at Demopolis to be from 48 to 60 feet so that the current was very swift and strong.

In making a turn in the river some distance above Demopolis, the boat backed up and the port side of barge 28 came in contact with the limestone bank of the river; but no damage was then ascertained to have been done to the barge.

The Mamie–D, on approaching the McDowell Bridge, maintained by the Southern Railway Company over the Bigbee river, blew the proper and customary signals as required by the quoted regulations established by the War Department.

1. *When a vessel approaches a drawbridge and desires to pass through the draw,* the person in charge of said vessel shall cause to be sounded, not less than one mile from the bridge, three long distinct blasts of a whistle or siren.

2. *When the draw of the bridge can be opened immediately,* the draw tender shall display a large white flag by day, and a green light at night, of sufficient power so that it may be seen at least one mile from the bridge.

3. *When the draw of the bridge cannot be opened immediately,* the draw tender shall

display a large red flag by day and a red light at night of sufficient power so that it may be seen at least one mile from the bridge.

4. *When the draw tender is uncertain as to whether the person in charge of the vessel understands the signals displayed, he shall cause to be sounded:* ·

a. *When the draw of the bridge can be opened immediately,* two short distinct blasts of a whistle or siren, powerful enough to be heard at least one mile from the bridge.

b. *When the draw of the bridge cannot be opened immediately,* one distinct blast of a whistle or siren, powerful enough to be heard at least one mile from the bridge.

5. These regulations shall take effect and be in force on and after August 1, 1930.

Approved July 16, 1930.

The flotilla reached this bridge about dusk on October 27, 1932. Approximately about three-fourths of a mile from the bridge there is a bend which prevents the bridge being seen by boats coming down the river until they round the point of the bend, and stern wheel steamers, such as the Mamie-D, customarily round this point in high water, and drift for a little way, then back up, flanking across from the west side to the east side before going through the east side of the draw in the McDowell Bridge, because the current, by reason of the bend, is thrown to the west side of the river and is very swift, so that they customarily use the east side of the draw in passing.

On rounding the bend, the pilot and crew saw that the bridge was not open, so the pilot drifted as usual and then backed up to the east side of the river, intending to land and tie up until the bridge was ready for him to go through. The water from the river overflowed the east bank at this point, so that there was a large cottonwood tree standing out in the water, and it was to this tree the pilot intended to tie up the boat until the bridge was ready for him to go through.

The current on the west side of the river was very fast and that bank was a high limestone bluff, making it a dangerous point for a boat to be caught in with the bridge just below.

In backing alongside of the tree the rear port side of barge 28 came in contact with the tree so that the pressure on this corner, acting as a fulcrum around the port rear side of barge No. 36, caused the barge to pull its front starboard side loose, letting in a quantity of water, which ultimately caused the barge to sink with a loss of some of the cot-

ton and the damage of more of it, for which the libel is filed.

The Warrior Packet Line, on being libeled by the shippers, vouched in the Southern Railroad Company, setting up that the damage to the barge was caused by the negligence of the bridge tenders in failing to have the bridge open so that the flotilla could go through, and that the flotilla was therefore forced to land alongside of the tree where the injury to the barge was consummated.

There are two primary issues in the case, the first being whether barge No. 28 was seaworthy at the time she loaded the cotton aboard, and the second was whether or not the crew at the bridge failed to perform their duty properly, and hence were so negligent as to cause the towboat to undertake to land and tie up, thus causing the injury to the barge. Of course, there are several other minor issues, but these are the issues in the case.

It appears that in May, previous to the shipment, this barge was inspected by Captain W. J. Frisbie, who found certain repairs needed and they were ordered to be made, and the testimony tended to show they were made, and she was then put in service.

Within a few days after the opening of the side of the barge 28, she was examined by a shipwright, who testified that the corner where the parting took place was quite rotten, and he produced in court several pieces of rotten wood which he testified he took from the timbers at that place. One of these pieces of wood was some three or four feet long and came out of the head log of the barge. He also testified to the rotten condition of several of the framing timbers on the same side of the barge and some other rotten conditions in the timbers around there. There was much testimony offered as to the general question of whether or not had the timbers been sound the ropes would have been broken or whether or not the ropes, which testimony showed to have been wrapped three times around the bits between the barges, so as to make six strands of rope, had sufficient strength to pull the side of the barge out even if it was sound.

After considering the evidence, I am convinced that the barge was not seaworthy at the time of the shipment.

There is testimony of a negro hand that while the boat was flanking across from the west side to the east side in backing up, this same place opened and he called out stating that the side had pulled out. There is also testimony of one of the firemen that he heard

this call and, as soon as the boat was tied up, he so stated to the pilot. There are reasons to discredit this testimony.

It is probable that when the barge came in collision with the chalk bank higher up the river, though the side did not then pull out, it was injured so that it required much less strain, much less blow, when she came in contact with the tree to cause the side to pull open sufficiently to allow the water to run in, in sufficient quantity to sink her.

However, had the barge not come in contact with the tree, it may be that she would have held sufficiently to enable her to come on and deliver her cargo in Mobile.

As to the negligence of the bridge crew:

After blowing the proper signals the proper distance up the river, the flotilla came on down and on rounding the bend, and coming into sight of the bridge, they could see that the bridge was not open, and the draw had not started to open.

They also, at that time, saw a man with a lighted lantern passing from the west bank along the bridge towards the center pier. The testimony of the negro Albert Jones was that he was on duty on the bridge, that he heard the signals as the boat came down, that he was alone, and then put out the red lights to stop the trains on each side of the draw, and that Mr. Haddock was supposed to be on duty with him, that their watches were sixteen hours on and eight hours off, there being three men in the crew, that Mr. Haddock lived about a mile from the bridge and had gone home, but that Mr. Mills, who lived right on the west bank of the river near the bridge, had agreed to take his place when called, if help was needed, that it ordinarily took two men to operate the mechanism efficiently, that when he put out the red lights to warn the trains, he called Mr. Mills who came out and helped him raise the bridge so the draw would clear the tracks, that then Mr. Mills left the center pier and walked across to the west side of the draw where he took a crowbar and helped to break the connection between the rails so as to start the swing of the draw, that at that time Mr. Haddock came along the bridge with a lighted lantern, coming to the center, where he helped him turn the draw span.

Now, it is manifest that Mr. Mills could not have crossed from the draw to the fixed span, or Mr. Haddock could not have crossed from the fixed span to the draw after the connection had been broken, so that the span of the draw could not have started opening until some time after the Mamie–D and her barges turned the bend above the bridge and came down in close proximity to the west bank and the bridge.

Mr. W. H. Spidle testified that he lived near the west side of the bridge, and hearing the boat coming, walked up to the bridge and stood on the fixed span, and while he was there he looked up and saw the Mamie–D within a few feet of the rock wall, so close that he considered it dangerous. At that time he looked over to the draw span, which was then clear open.

Under the testimony of the other witnesses, this witness was necessarily mistaken as to the span being clear open at that time. The probability is that he did see the proximity of the Mamie–D to the rock wall on the west bank, and that because she appeared in danger he watched her for some time while she was making her maneuver backing up and flanking over to the east side, and when he finally did look after this maneuver was practically completed, he saw the open span. Under such circumstances it is easy to understand how a witness can be confused about the correlative time of incidents while he is very clear as to the incidents themselves.

The negro bridge tender, who was very clear in all of his statements and evidently tried to tell just what happened, stated that the draw was open sufficiently for the boat and tow to come through before the boat tied up on the east bank, so that as a matter of fact, she might have come through without the necessity of tying up, and I am satisfied that this is true.

Mr. Mills also testified that when he saw the boat could come through, he waved a white lantern several times, indicating to the boat that she might then proceed and come through the draw. No such signal is specified in the regulations prescribed by the War Department. A boat seeing such a signal might well suppose it was a warning not to come on, instead of an invitation to do so. The rules provide for certain signals by a horn or other noise instrument.

I am convinced that the bridge crew was negligent and that the pilot, when he came around the bend, by reason of seeing the red light which was showing, and also by reason of the fact that there was still sufficient light for him to see the bridge itself, found his boat and tow in a position of grave danger, because the bridge had not then even started to open, concluded that it was necessary to back up and flank across the river and tie up his

tow. It is true that he testified that after observing the position of danger, and making up his mind it would be necessary to tie up on the east bank, he did not again look at the bridge to see whether he could have gone on through without tying up.

It is well recognized that where one, by reason of his negligence, puts another in a position of danger, he cannot require of such other that his conduct thereafter shall be free from fault, and I think this proposition is well illustrated in this particular instance. Boland v. Combination Bridge Co. (D. C.) 94 F. 888.

A master will be appointed to fix the damages.