CITY OF CHICAGO v. MULLEN et al.

DUNHAM TOWING & WRECKING CO. v. MULLEN et al.

(Circuit Court of Appeals, Seventh Circuit. May 6, 1902.)

Nos. 814, 815.

**1. NAVIGABLE WATERS—INJURY OF VESSEL BY DRAW OF BRIDGE—NEGLIGENCE OF TENDER.**

An injury to a schooner by being struck by the draw of a bridge in Chicago river, while she was being towed through, *held*, under the evidence, to have been due to the gross negligence or incompetency of the bridge tender in failing to stop the draw when it had swung to the proper position.

**2. SAME—ORDINANCES REGULATING DRAWBRIDGES—SIGNALS FOR PASSING.**

The ordinances of the city of Chicago for the protection of the bridges over the Chicago river prohibit any vessel from approaching nearer to any of said bridges than the end of the bridge protection when the bridge may be opening or closing. The same ordinance also provides for the maintenance on each bridge of signals to be operated by the bridge tender to notify vessels approaching when the bridge is closed and when open for passage. *Held*, that a tug was not in fault for approaching and entering the opening of a bridge with her tow, after the signal that it was open had been given her by the bridge tender, notwithstanding the fact that the draw had not then been fully opened and locked.

Appeal from the District Court of the United States for the Northern District of Illinois.

In Admiralty.

On April 26, 1900, the schooner Commerce was proceeding down the Chicago river toward Lake Michigan in tow of the tug O. B. Green. She had been taken in tow by the tug at a dock just north of Kinzie street, on the North branch of the Chicago river. After passing the Kinzie street bridge and the two railroad bridges, and at about the junction of the North and South branches of the Chicago river, the tug blew the usual signal for the Wells street bridge to open. This bridge was 400 feet further down the river. The bridge did not open promptly, so the tug checked her speed or came to a full stop, and blew a second signal for the bridge. In a short time the bridge tender rang the bridge bell, and, as claimed by the Dunham Towing & Wrecking Company and denied by the city of Chicago, lowered the red-ball signal, and began to open the bridge, swinging the north end of the bridge toward the east, the direction in which the tug was heading. The tug, with the schooner in tow, then started for the north draw of the bridge at a moderate rate of speed. The bridge, instead of stopping when it was fully open due east and west and parallel with the bridge protection, continued to swing. The bow of the schooner had reached a point just east of the west end of the center protection of the bridge, and as the bridge continued to swing it fouled the forerigging of the schooner, and caused the damage complained of.

Edward Mullen, the owner of the schooner, filed his libel in personam against the city of Chicago and the Dunham Towing & Wrecking Company, the owner of the tug, to recover the damages sustained. The libel attributed the fault to the negligence of those in charge of the bridge in not stopping its course after it had been opened, and in permitting it to swing after it had been fully opened for the passage of the schooner, and after she had been permitted to enter the draw or channel in range of the bridge. The libel charged no fault upon the Dunham Towing & Wrecking Company, but propounded that the tug would be charged with fault by the city of Chicago, and therefore made the owner of the tug party to the libel, being unable, as the libel states, to point out any special fault or negligence of which the tug was guilty, but, if such fault should be discovered, asked

to avail himself of the privilege of so charging and urging any fault that may be established against the tug by any of the parties to the proceeding. The city of Chicago by its answer charged no fault upon the schooner; asserted that when the whistle of the tug was sounded the bridge tender prepared to swing the bridge to an open position; "that the bridge ball which is used as a signal for on-coming vessels, as provided in and by the ordinances of the city of Chicago hereinabove set forth, when up warning them not to enter the draw, and when down as a signal for them to proceed through the draw, was left up upon said bridge, and so remained at the time and during the collision; that said bridge ball was left up as a signal to said tug O. B. Green and said schooner Commerce to stop and not to proceed towards said bridge." It then charges that the tug and schooner were at a sufficient distance from the bridge to avoid the collision, but no effort was made by the tug to stop, but it proceeded toward the bridge without checking its speed; "that while said tug and schooner were coming on at a moderate speed the bridge tender was swinging said bridge to an open position; that the bridge ball was still up on said bridge as a signal for said tug and schooner not to come on; that said bridge ball was left up upon said bridge as a signal to said tug and schooner not to proceed toward said bridge until said bridge was in an open position and stopped in the center of the river; that said tug and schooner, not regarding said bridge ball signal being up, came on without checking their speed; that when said bridge reached an open position said bridge tender was unable to check the speed of said bridge and stop it, and said bridge continued swinging beyond an open position, and before it was stopped some damage was done to said schooner." The answer charges the collision to the fault and mismanagement of the schooner or her tug in not stopping in accordance with the bridge-ball signal displayed and in accordance with the ordinances of the city of Chicago; "that the only signal to vessels to proceed toward the draw is the lowering of the bridge ball in the day time, and of the red light in the night;" and that the collision would not have occurred had proper efforts been made by the tug to stop the schooner.

The answer of the Dunham Towing & Wrecking Company charges that, in answer to the signal of the tug to open the bridge, the bridge tender in charge lowered the red-ball signal and opened the draw of the bridge, and the tug, with its tow, proceeded at a moderate rate of speed down through the north draw of the bridge; and after the tug had entered fully into the draw, and the schooner, in tow of the tug, was about entering the draw, the bridge, without warning, started to close again, the west end of the bridge swinging around to the north instead of remaining at the center after the bridge was fully opened, and the west end of the bridge was thus swung around directly in front of the schooner, and fouled, and caught in the schooner's rigging. doing the damage,—the fault being charged wholly upon the bridge tender.

The ordinances of the city of Chicago referred to in the answer are as follows:

"204. (Vessel Signals.) The commissioner of public works is hereby required to provide and maintain at the several bridges over the Chicago river and its branches, in the best and most practicable manner, vessel signals as required by this article.

"205. (Signals Prescribed.) Said signals shall be material of a red color for use in the day time and shall be of such size and so placed, when elevated that they may be readily seen up and down the river. The signal for the night time shall be a red lantern of such size and so placed and arranged when elevated as to be easily seen up and down the river and the street.

"206. (Duty of Vessels.) It shall be unlawful for the owner or owners, officer or officers, or other person or persons in charge of any vessel or vessels navigating the Chicago river or its branches or any part thereof, to attempt to pass any of the bridges over the said river or its branches, while said signal or signals are up or elevated, or to approach nearer than the end of the bridge protection to any of said bridges, at such times as that the same may be injured or damaged, or while the said bridges, or any of them, may be opening or closing."

The testimony was taken in open court before the district judge, who pronounced for the libelant against both of the respondents, dividing the damages between them. From this decree the City of Chicago appeals in the first case, asserting that it ought not to be held responsible for the damage; and the Dunham Towing and Wrecking Company in the second case, by cross appeal, asks for a review of the decree, claiming that it was blameless, and that the fault was attributable wholly to the city of Chicago.

Wm. H. Sexton, for City of Chicago.

C. W. Greenfield, for Dunham Towing & Wrecking Co.

C. E. Kremer, for Edward Mullen.

Before JENKINS and GROSSCUP, Circuit Judges.

JENKINS, Circuit Judge (after stating the facts as above). A careful review of the evidence fully satisfies us that the collision of the bridge with the rigging of the schooner and the resulting damage to, the schooner were caused by the fault of the bridge tender in charge of the Wells street bridge. This bridge was operated by electricity. The failure to stop the bridge upon the centre protection was clearly owing, as the evidence discloses, to the failure of the bridge tender to shut off the current when the bridge had reached the proper position. He attempted to stop it by means of a foot brake and without turning off the current. After the injury had been done, another person swung the bridge back to the approach and to its correct position, and closed the bridge. The machinery was in perfect working order, and could have been readily managed by a competent person attentive to his duty. It was a case of gross incompetency or gross negligence. The bridge tender had been employed in that work not quite two months at the time of the accident. Prior to that time he had never operated an electric motor and knew nothing of electrical machinery; he was a novice to the business, and lost his head at a critical moment.

It is said that notwithstanding this the tug had no right to enter the draw until the bridge was swung and locked, because it is forbidden by the ordinance and the ball was up. There is much dispute in the evidence touching the latter fact, but the large preponderance of the evidence goes to show that the bridge tender lowered the red ball either when the bridge commenced to swing or during the process of swinging and before the tug reached the draw. We have critically searched the record upon this question, and are of opinion that the court below was fully justified in finding that the ball was lowered. The ordinances pleaded are upon their face provisions for the protection of bridges, and so far as they are reasonable should be sustained by the court. They provide for signals by day and by night, an elevated red ball being used in the daytime as a signal to those plying the river that the bridge is closed. When that signal is lowered it tells an approaching vessel that the bridge is open and that it may safely proceed. The ordinance, it is true, declares it to be unlawful to attempt to approach nearer than the bridge protection while the bridge may be opening or closing. But the city by the same ordinance, and practically by its conduct and the conduct of its agent having charge of the bridge, has designated the means by which those in charge of vessels plying the river shall know whether the bridge is or is not

opened for passage. The ordinance does not require, nor does common sense demand, that vessels navigating the river shall heave to at each of the numerous bridges that span the river, and critically examine whether the bridge has been swung and whether it has been locked. The city has designated the means by which they are to be informed of the fact. If the red ball be elevated, it is a signal that the bridge is closed; if it be lowered, it is a signal that it is open and that vessels are free to come and go. The lowered ball is an invitation to the vessel signaling for the opening of the bridge that the way is free and that it should enter the draw. This is a reasonable construction of the ordinances, and the only one, as we think, of which they are susceptible. It is the construction which the city itself has placed upon its regulations. Its answer distinctly asserts that the red ball when down is a signal to vessels to proceed through the draw. When, therefore, it is established that the red ball was lowered, the bridge tender invited the tug to come on with her tow and to enter the draw. The city cannot escape the consequences of the gross negligence of its agent in charge of the bridge, because the tug accepted the invitation of the bridge tender upon the assurance that the way was clear, and that the draw of the bridge was open for her passage. The court below, finding the ball signal to have been lowered, divided the damages upon the theory that nevertheless the tug was in fault in proceeding before the bridge was opened and locked, notwithstanding the invitation to proceed. Therein the trial court erred.

Upon the appeal of the city of Chicago the decree is affirmed. Upon the appeal of the Dunham Towing & Wrecking Company the decree is reversed, with costs to be taxed against the City of Chicago, and the cause is remanded to the court below, with direction to pronounce for the libelant for his damages in solido against the City of Chicago, and to dismiss the libel as to the Dunham Towing & Wrecking Company, with costs to be taxed against the City of Chicago.