## F. C. Batchelder, Receiver, Appellant, v. Hecla Transportation Company, Appellee.

### Gen. No. 17,898.

1. BRIDGES—*rights of navigation.* Under the doctrine in admiralty, the right of navigation is paramount, and a bridge spanning a river should be equipped with proper signals, giving warning of its position and its opening and closing, and a vessel having given the proper signal to open the bridge and prudently proceeding under slow speed has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage, and she is not bound to heave to until the bridge has been

swung or raised and locked and to critically examine the situation before proceeding, but may carefully proceed at slow speed upon the assumption that the bridge will open in response to the signal, until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened, when it becomes the duty of the vessel, if possible, to stop and, if necessary, to go astern.

2. BRIDGES—*failure to signal that bridge cannot be opened.* Where a bridge tower man fails to display a proper signal of warning to an approaching vessel that the bridge cannot be opened because of an engine having stopped on the derail, the master of the vessel, after signaling her approach, is justified in considering his conduct as an invitation to proceed, and no liability attaches for injuries caused to such bridge in a collision.

3. BRIDGES—*injuries to bridge by vessel.* An action to recover damages for injuries caused to a bridge by a vessel is to be viewed as a simple action in tort, and the petitioner must prove by a preponderance of the evidence that defendant's negligence caused the accident and that the petitioner was free from contributory negligence.

Appeal from the Circuit Court of Cook county; the Hon. LOCKWOOD HONORE, Judge, presiding. Heard in the Branch Appellate Court, at the October term, 1911. Affirmed. Opinion filed March 6, 1913.

JESSE B. BARTON and CHARLES E. KREMER, for appellant.

CHURCH & McMURDY, for appellee.

MR. JUSTICE McSURELY delivered the opinion of the court.

This is a proceeding under the Watercraft Act of Illinois by the receiver of the Chicago Terminal Transfer Railroad Company against the Steamer Eber Ward, of which the Hecla Transportation Company was the owner. A petition under the act was filed in the Circuit Court of Cook county, and the steamer was attached but released upon the filing of a bond by the owner.

The case arises out of a collision occurring December 6, 1908, at about 7:20 o'clock A. M., between the

steamer Eber Ward, south-bound in the south branch
of the Chicago river, and the lift bridge of the peti-
tioner across the river just south of Taylor street,
by which the bridge was damaged to an amount which
by agreement and stipulation is fixed at $14,487.85.
The bridge was one used by several railroads crossing
the south branch of the Chicago river.   The general
direction of the river at this point is north and south,
with the current running south away from the lake,
so that a boat moving up the river is really going with
the current.   Just north of the railroad bridge is the
Taylor street bridge, a city bridge, and the distance
between the two bridges on the east bank is about 195
feet and on the west bank somewhat more than 400
feet.   This difference in measurement is caused by
the fact that the railroad bridge crosses the river at an
angle approximately running north and south.   Both
bridges are of bascule type, operated by electricity,
which opened by rotating on the shore ends of the
leaves vertically.   On the shore at each end of the rail-
way bridge is a tower, some 60 feet in height, each
occupied by a bridge tender, and the passenger station
of the roads using the bridge is about 1,000 feet east
or north of the easterly or northerly end of the bridge.
Between the station and the bridge are express and
freight houses and tracks spreading out from the
bridge like a fan.   Between the station and the bridge
and about 600 feet east of the latter is a tower house,
occupied at the time of the accident by a man named
Bright, who by means of a system of locks and levers
controlled the movements of the trains on that side
of the bridge, determining when and on what tracks
they should proceed.   The two leaves of the bridge are
operated by the tower men at either end thereof by
means of a lever turning on the electric power, but
when the bridge is closed an iron bar clutches and
locks the handles of their levers so that they cannot be
moved until released, and this was completely under

control of the tower man Bright. Ordinarily the time occupied by the tower man, Bright, in releasing the lock was about five seconds, and the further work of opening the bridge by the bridge tenders to its full width occupied from a minute to a minute and a half. Between this tower and the bridge was a mechanism called a derail, located about 350 feet from the bridge. This was a device for preventing trains from passing it towards the bridge without the permission of the tower man, and was for the purpose of safety by preventing trains going towards the bridge while it was open. This mechanism was so operated and connected with the bridge tenders' locks that if an engine or car was standing on the derail the bridge could not be opened. It appears from the evidence that every other bridge on the river except this one was equipped with some device for giving warning signals. This bridge was not so equipped and had no method of signaling to approaching boats of its indisposition or inability in any case to open in response to the usual signal. On the morning in question the Eber Ward, without any cargo, was coming up the river for the purpose of laying up for the winter. It seems to be necessary in order to preserve steerageway that the boat should go somewhat faster than the current, and the evidence tends to show that the current was at this time about two miles per hour and that the average speed of the boat was two and one half miles per hour. The steamer was 220 feet long over all and was a wooden propeller of twelve or fifteen hundred tons burden. At Polk street the usual signal was given for the opening of Taylor street bridge, and was responded to by her bridge tenders without delay. When the captain of the steamer saw that bridge begin to open and while he was some 800 feet from the railway bridge, he gave the signal for that bridge to open. It is admitted that at the time the signal was given, and thereafter, there was no train or engine moving on or

near the bridge, or in any position as though it were attempting to cross, and that nothing occurred to indicate that the railroad bridge would not open in time to permit the steamer to pass. It is also admitted that the Ward signal was heard and understood by the bridge tenders and those in control of the bridge, and that the Ward expected the bridge to open, and that there was plenty of time for the bridge to open if the bridge tenders had received the signal from the tower man Brooks. The evidence also tends to show that had the bridge begun to open at the time the bow of the boat reached the Taylor street bridge it could have been opened in time for her safe passage. As the boat approached Taylor street bridge she was going too slow to give her steerageway, so the speed was increased slightly, and then after going 15 or 20 feet the signal was given to stop the engine, to check her down. When half way through the Taylor street bridge, the master of the vessel, observing that the railroad bridge had not started to open, undertook to stop the boat's headway and gave signals for this purpose. There is some dispute as to whether these signals were answered as promptly as they should have been answered. Before she had passed completely through the Taylor street bridge she was reversing at full speed astern. However, she drifted on with the current until she struck the bridge, inflicting the damage complained of.

Some time before the Ward's signal was given a train of the Pere Marquette railroad had come in, and after discharging its passengers was drawn by a switch engine west towards and onto the railroad bridge, then back onto the side track, so that the express car could be cut off, and then the remainder of the train was to cross the bridge to the yards of the railroad on the other side of the river; but when it had proceeded to within 30 to 40 feet of the bridge the coupling of one of the Pullman cars gave way, thus breaking the train in two and bringing it to a stop, with the switch engine standing upon the derail, and

there it stood for five or ten minutes waiting for the train to be coupled up again so that it could proceed; but in the meantime the collision had occurred.

The evidence tends to show that the tower man, Bright, heard and understood the opening signal given by the steamer while the train was being hauled out of the station by the switch engine and before it reached the bridge, but that the signal was disregarded and the switching operations continued. With the switch engine standing on the derail the lock could not be released and the bridge could not be opened. There seems to have been no urgency requiring the movement of the Pere Marquette train by the switch engine, one of the witnesses stating that there was no occasion at that time to take the train out of the station to make room for others, and that the only purpose of the switching was to make the train ready to go out again that evening, which would be nearly twelve hours thereafter. There is also a statement by the witness Bright, the tower man, to the effect that at the time the bridge was struck it was unlocked.

The case was tried by the court without a jury, and the court found against the petitioner and for the defendant upon the ground that the proximate cause of the accident was the negligence of the petitioner, his agents and servants, and from this judgment petitioner has appealed to this court.

Counsel have earnestly and ably argued many points, which in our view of the case it is not necessary to discuss in this opinion. If we were to consider this case as controlled by the doctrine in admiralty, we should apply the rule stated by Mr. Justice Jenkins in Clement v. Metropolitan West Side El. Ry. Co., 59 C. C. A. 289, 123 Fed. 271 (273), and restated and followed in Munroe v. City of Chicago, 194 Fed. 936:

"A bridge spanning a navigable river is an obstruction to navigation, tolerated because of necessity and convenience to commerce upon land. Such a structure must be so maintained and operated that navigation

may not be impeded more than is absolutely necessary; the right of navigation being paramount. It is incumbent upon the owner that the bridge be so constructed that it may be readily opened to admit the passage of craft, and maintained in suitable condition thereto. It is also his duty to place in charge those who are competent to operate the bridge, to watch for signals, and to open the bridge for the passage of vessels, and for the performance of such delegated duty he is responsible. It is also his duty to equip the bridge with proper lights, giving warning of the position of the bridge and of its opening and closing. If for any reason the bridge cannot be opened, proper signals should be given to that effect, such as will warn the approaching vessel in time to heave to. A vessel, having given proper signal to open the bridge and prudently proceeding under slow speed, has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage. She is not bound to heave to until the bridge has been swung or raised and locked, and to critically examine the situation before proceeding (City of Chicago v. Mullen, 54 C. C. A. 94, 116 Fed. 292), but may carefully proceed at slow speed upon the assumption that the bridge will open in response to the signal, and may so proceed until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened (Manistee Lumber Co. v. City of Chicago [D. C.] 44 Fed. 87; Central Railroad Company of New Jersey v. Pennsylvania Railroad Company, 8 C. C. A. 86, 59 Fed. 192), when it becomes the duty of the vessel, if possible, to stop, and, if necessary, to go astern.''

We might well follow the conclusion reached in Munroe v. City of Chicago, for the circumstances and the accident there involved were practically the same as in the case at bar. In that case the Circuit Court of Appeals held that the accident was caused by the failure to signal from the bridge that it could not be opened promptly for the approaching vessel.

However, we discern no reason for considering this

case as controlled by any other doctrine than the usual rules in tort cases followed in the common-law courts of this state. This should be viewed as a simple action in tort, to be determined by the laws of this state, wherein the alleged wrong was committed. Wiggins Ferry Co. v. Reddig, 24 Ill. App. 260. It therefore follows, under familiar rules, that the petitioner to sustain his right to recover must prove by a preponderance of the evidence that the defendant was guilty of the negligence charged, which caused the accident in question, and also that the petitioner himself was free from any negligence which contributed to the accident.

It is very doubtful if it can be said that negligence of the defendant causing the accident was proved by the greater weight of the evidence. The trial court found, in effect, that the vessel was managed and navigated with reasonable care and skill under the circumstances, and we can hardly say that this finding was manifestly against the weight of the evidence. However this may be, the question as to whether the negligence of the petitioner caused the accident is reasonably clear from doubt. No sufficient explanation appears as to why the bridge could not have been raised after the signal from the Ward was heard, before any attempt was made to run the train across it for the purpose of distributing the cars on the other side. There was no urgent need for distributing the cars at that time; it was not necessary to move them to make room for other cars or trains, and they would not be needed for use until about twelve hours later. The tower man seemingly took a chance that he could succeed in running the train across the bridge before the vessel was near enough to strike it, but his purpose was defeated by the breaking of the coupling, and proper caution might have suggested that some such mishap might occur. Neither is there any satisfactory explanation offered as to why no signals were displayed or warning given to the oncoming vessel that

the bridge would not be opened promptly in response to the Ward's signal. When the switch engine stopped on the derail, thus preventing the opening of the bridge promptly, an immediate warning should have been given to the approaching vessel. Instead of such warning, however, the conduct of those in charge of the bridge, together with the absence of any train on or about it, might well have been considered by the master of the vessel as an invitation to proceed and as a promise that the bridge would be open in ample time to permit passage.

The trial court made certain findings of fact, which are as follows:

"1. That at the time of the occurrence of the collision between the steamer Eber Ward with petitioner's bridge, set forth in the amended petition, it was the general custom in the operation of the bridges on the south branch of the Chicago river, except the petitioner's bridge, to give a warning or stop signal to approaching boats when for any reason the bridge would not be opened in response to an opening signal from such boat and such bridges were generally provided with devices or mechanical signals for that purpose, but at no time while the steamer Ward was approaching petitioner's bridge after giving its opening signal, was any such warning or stop signal given by those in charge of petitioner's bridge to said steamer, nor was such bridge provided with any means for giving such warning or stop signals, nor was there anything in the appearances of the bridge or of its approaches at either end to indicate to the master or crew of the boat that it would not be opened in due season for the passage of the steamer, beyond the mere fact that it was closed.

"2. That the steamer Ward, from the time its opening signal to the petitioner's bridge was given, was managed and navigated with such a degree of care and skill that had a suitable warning or stop signal been given to it with reasonable promptness after the receipt by the petitioner's bridge tender of said opening signal, said steamer could readily have been

stopped before reaching petitioner's bridge and the collision of the steamer therewith have been avoided, and that reasonable care and prudence under the circumstances required that such a warning or stop signal should have been given by those in charge of said bridge.

"3. That the petitioner at the time of and immediately prior to the collision of the steamer Eber Ward with the petitioner's bridge, was guilty of negligence in the management and operation of said bridge.

"4. That the failure of petitioner to open said bridge in response to the Ward's opening signal was due to causes wholly within the control of petitioner, and of which defendant and its servants had no knowledge or control.

"5. That the petitioner was guilty of negligence in not opening said bridge in response to the signal given by the master of said steamer Ward, indicating his desire to pass through said bridge.

"6. That the petitioner was guilty of negligence in not giving a warning signal to the steamer Ward of the inability of the bridge tender to open said bridge in response to the Ward's opening signal.

"7. That the petitioner, at the time of and immediately prior to the collision of the steamer Ward with the petitioner's bridge and after receiving the signal indicating the desire of the master of said steamer to pass said bridge, did not exercise proper care for the safety of said bridge, but was guilty of negligence in that respect.

"8. That the proximate cause of the collision of said steamer Ward with petitioner's bridge and the resulting injuries to said bridge, was the negligence of petitioner, his agents and servants."

After careful consideration we are of the opinion that these findings were justified upon the evidence and should not be disturbed. Petitioner having been guilty of the negligence which was the proximate cause of the accident is not entitled to a recovery, and the judgment of the trial court is affirmed.

*Affirmed.*