### CITY OF CHICAGO v. CHICAGO TRANSP. CO. et al.

(Circuit Court of Appeals, Seventh Circuit. January 5, 1915.)

No. 2141.

NAVIGABLE WATERS ⬥2—BRIDGES—MUNICIPAL REGULATIONS.

The city of Chicago by ordinance provided that its drawbridges over the Chicago river should be marked by an elevated red ball by day and a red lantern at night, and prohibited any vessel from approaching a bridge until invited by the lowering of the ball or lantern, providing that "at all other times such signals shall remain elevated." *Held*, that it was not within the power of the city, maintaining bridges which were an obstruction to navigation, by so posting a universal denial of the right of approach, to relieve itself of the duty of having bridge tenders on duty, who should answer a vessel's requests for passageway by giving promptly the information that was appropriate to the immediate occasion.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 2, 63; Dec. Dig. ⬥2.]

---

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois; George A. Carpenter, Judge.

Suit in admiralty by the Chicago Transportation Company and T. Bernstein against the steam tug Fitzgerald and the City of Chicago. Decree for libelants against the City of Chicago, and the City appeals. Affirmed.

S. A. T. Watkins, of Chicago, Ill., for appellant.

J. Sidney Condit and Charles E. Kremer, both of Chicago, Ill., for appellees.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

BAKER, Circuit Judge. The schooner Skeele, in tow of the tug Fitzgerald, was proceeding south with the current in the South branch of the Chicago river. Bridges at Randolph and at Washington streets were of the jackknife type, and consisted of two leaves that could be swung upward by electric power. Each bridge had two tenders, one for the operation of each leaf. When the tug signaled for the Randolph bridge to open, both leaves started to rise; but the movement, by failure of the electric apparatus, was not completed. To maneuver the schooner through the partially opened Randolph draw, the tug increased her speed. Before entering that draw, or while therein, she signaled for the Washington bridge to open. At that time, and until after the collision occurred, the tender of the west leaf of the Washington bridge was absent. No direct answer to the tug's request was given; but the street bell was rung and the bridge was cleared of traffic. Immediately after clearing the Randolph draw, the tug decreased her speed. There was then abundant time for the Washington draw to open, if both tenders had been at their posts. Seeing that the bridge was not starting to open, the captain of the tug reversed her engines, and the tow lines (new and heavy ones provided by the schooner) broke under the strain. And so the schooner drifted with the current against the closed bridge and received the injuries complained of.

Manifestly the schooner was blameless; and ample evidence is in the record to support the finding of the trial judge, who heard and saw the witnesses, that the tug was properly navigated and was free from fault. A question of law is all that merits notice.

By an ordinance the city has undertaken to forbid vessels to approach its drawbridges while a red ball by day or a red lantern by night is displayed in an elevated position thereon. If the city, through its bridge tenders, is ready and willing to permit a vessel to pass, the lowering of the elevated ball or lantern is an invitation to approach and pass through. "At all other times such signals shall remain elevated." And the question of law is: May the city, by posting a universal 'No,' excuse itself from having bridge tenders on duty who shall answer a vessel's requests for passageway by giving promptly the information that is appropriate to the immediate occasion? We think not, and the reasons briefly are as follows:

Where the subjects over which the national power to regulate commerce are local in their nature or operation, the authority of the state

and its municipal agencies may be exercised until Congress speaks. And so, prior to congressional action, vessel owners could not complain of dams and immovable bridges in navigable waters wholly within a state, which had been built under the state's authorization. Willson v. Black Bird Creek Marsh Co., 2 Pet. 245, 7 L. Ed. 412; Gilman v. Philadelphia, 3 Wall. 713, 18 L. Ed. 96. Likewise, in the absence of national control, ordinances of Chicago closing navigation on the Chicago river for an hour in the morning and also in the evening, and dividing the residue of the time into ten-minute periods between navigation and street traffic, were found not to be violative of the commerce clause of the Constitution. Escanaba Co. v. Chicago, 107 U. S. 678, 2 Sup. Ct. 185, 27 L. Ed. 442. That case was decided in 1882. From shortly thereafter to the present time there have been acts of Congress covering the construction of bridges, dams, etc., in navigable waters. With national authority paramount, the respective rights of navigators and of local municipalities operating bridges were admirably stated by Judge Jenkins in Clement v. Metropolitan West Side El. Ry. Co., 123 Fed. 271, 59 C. C. A. 289:

"A bridge spanning a navigable river is an obstruction to navigation, tolerated because of necessity and convenience to commerce upon land. Such a structure must be so maintained and operated that navigation may not be impeded more than is absolutely necessary, the right of navigation being paramount. It is incumbent upon the owner that the bridge be so constructed that it may be readily opened to admit the passage of craft, and maintained in suitable condition thereto. It is also his duty to place in charge those who are competent to operate the bridge, to watch for signals, and to open the bridge for the passage of vessels, and for the performance of such delegated duty he is responsible. It is also his duty to equip the bridge with proper lights, giving warning of the position of the bridge and of its opening and closing. If for any reason the bridge cannot be opened, proper signals should be given to that effect, such as will warn the approaching vessel in time to heave to. A vessel having given proper signal to open the bridge and prudently proceeding under slow speed, has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage. She is not bound to heave to until the bridge has been swung or raised and locked, and to critically examine the situation before proceeding (City of Chicago v. Mullen, 54 C. C. A. 94, 116 Fed. 292), but may carefully proceed at slow speed upon the assumption that the bridge will open in response to the signal, and may so proceed until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened (Manistee Lumber Company v. City of Chicago [D. C.] 44 Fed. 87; Central Railroad Company of New Jersey v. Pennsylvania Railroad Company, 8 C. C. A. 86, 59 Fed. 192), when it becomes the duty of the vessel, if possible, to stop, and, if necessary, to go astern."

In City of Chicago v. Mullen, 116 Fed. 292, 54 C. C. A. 94, the bridge tender, in pursuance of an ordinance, moved a red ball as an invitation to approach in answer to the vessel's inquiry. The consequences of failing or declining to answer were not considered. And in Munroe v. City of Chicago, 194 Fed. 936, 114 C. C. A. 572, we approved as reasonable an ordinance which required the bridge tender to elevate a red ball or a red lantern if he "for any reason cannot open the bridge." But that ordinance was the exact converse of the present one. Under that ordinance the bridge tender could answer a vessel's inquiry by saying: Keep away; I cannot open the bridge now. The

red ball or lantern, however, normally elevated in advance of any inquiry, gives no answer to a present question, conveys no information beyond that furnished by the closed bridge itself by day, and by the lights required by government regulations at night. To exercise reasonably its subordinate power the city should have bridge tenders at their posts of duty and should provide them means for answering definitely and promptly the inquiries of vessels desiring to pass through the drawbridges.

The decree is affirmed.