### THE RUSSELL No. 16.
### ROCKLAND OIL TRANSPORT CORPORA-TION v. RUSSELL BROS. TOWING CO., Inc., et al.

District Court, S. D. New York.

Dec. 3, 1938.

Macklin, Brown, Lenahan & Speer, of New York City, for libelant.

Alexander, Ash & Jones, of New York City, for claimant.

Clive C. Handy, of New York City (K. O. Mott-Smith, of New York City, of counsel), for New York Cent. R. Co.

LEIBELL, District Judge.

The libel filed by Rockland Oil Transport Corporation, owner of the tank barge "Rockland No. 1", is for damages sustained by the barge through stranding and collision with a New York Central drawbridge on October 3, 1935, in the Niagara River at Tonawanda, New York, while the barge was in tow of the tug "Russell No. 16", owned by the claimant herein, Russell Bros. Towing Co., Inc. The libel charges the tug with faulty navigation. The claimant impleaded New York Central Railroad Company, alleging failure of the bridge to open promptly when signalled.

The "Rockland No. 1" is a steel barge 173 feet long, 39.6 feet broad and was loaded with 440,000 gallons of gasoline consigned to the Cities Service Oil Company's dock at Tonawanda. The barge as loaded drew 9.4 feet forward and 9.6 feet aft, leaving 2 feet of freeboard. The tow left New York about 9 days before and reached the end of the New York State Barge Canal where it meets the Niagara River on October 3rd, 1935, about noon time. The barge was being towed "push fashion" by the tug, with cables running from the stern of the barge to the sides of the tug. The cables were taut, so that the barge was held in a rigid position ahead of the tug.

The tug "Russell No. 16" was 62 feet in length, 17.4 feet beam, 7.7 feet in depth, capable of developing 250 horse power with 150 pounds of steam. The maximum speed of the tug and its tow in slack water was 4 to 5 miles per hour; the best she could do in reverse was 2 miles per hour.

The northerly end of the State Barge Canal is at Tonawanda where it joins the Niagara River. The Niagara River flows in a northerly direction from Buffalo, on Lake Erie, towards Niagara Falls. Tonawanda is about midway between the two, 10 miles from each, and is located on the easterly or Tonawanda Channel of the Niagara River. A bend in the river forms a sack in which is located Tonawanda Is-

land. That part of the river that flows on the easterly side of the island is known as Tonawanda Harbor. The barge canal comes into the Tonawanda Harbor, part of the Niagara River, at Paper Mill Point, near the southerly end of Tonawanda Island, where it helps form a "Y", the upper left hand stroke being the barge canal; the upper right hand stroke, that part of the Niagara River flowing south from the direction of Buffalo; and the long down stroke, the Tonawanda Harbor branch of the Niagara River flowing north towards Niagara Falls.

Tows about to come out of the barge canal pass through a hand operated drawbridge (B 18A) about 400 feet southwesterly of Paper Mill Point on their port side. Tows bound for Buffalo turn to the left at Paper Mill Point and proceed southwesterly up the river against the current. Tows bound for Tonawanda generally turn left at Paper Mill Point for a short distance, cross the current to the south of Tonawanda Island and then turn right and come down the river on the westerly side of the island to its northerly point and then turn right in a southeasterly direction around the island into that branch of the river that forms Tonawanda Harbor. Very few tows leaving the barge canal turn right at Paper Mill Point into the current and head down the river in a northerly direction towards New York Central Railroad Bridge (B 18C), electrically operated, that crosses in a westerly direction from the mainland to Tonawanda Island. That bridge is used by the railroad and by vehicular traffic.

Under ordinary conditions the Niagara River flowing under the Tonawanda Island bridge has a current of about three miles an hour. But when there is a strong wind blowing from Lake Erie, from the southwest, the water rises several feet in the Niagara River and the current increases to four or five miles an hour.

As hereinabove stated the distance from the barge canal bridge to Paper Mill Point is about 400 feet, and from Paper Mill Point to the Tonawanda Island bridge about 1140 feet. The barge canal bridge is not involved in this litigation. The "Russell No. 16" and its tow passed safely through the barge canal bridge and had the Tonawanda Bridge in sight on their starboard about 1500 feet away.

The weather was bad. It was raining and there was a forty mile gale blowing in from the southwest, from Lake Erie, along the Niagara River in the direction of the Tonawanda Island bridge. The official United States Department of Agriculture, Weather Bureau, Buffalo Station, weather report for October 3, 1935, shows that at 11:00 A. M. there was a southwesterly wind with a velocity of 44 miles an hour and a precipitation of .06; at noon the wind was 38 miles an hour with a trace of rain; at 1:00 P. M. the wind was 44 miles an hour with a trace of rain.

The captain and mate of the "Russell No. 16" testified that they were both in the pilot house of the tug as they came through the barge canal bridge (B 18A) about noon on October 3, 1935. The captain had a license to pilot in the Niagara River; the mate did not. The mate handled the wheel. The Cities Service Oil Company's dock was to the north of the Tonawanda Island bridge (B 18C) so that the captain had a choice of two routes as he came out of the barge canal. He might have gone to port at Paper Mill Point and attempted to cross the current and then swing around the southerly end of Tonawanda Island and proceed northerly on the westerly side of Tonawanda Island to the Cities Service Oil Company's dock, which was about a mile north of the northerly tip of Tonawanda Island. This would have entailed great risk considering the force of the wind (40 miles) and the current (4 or 5 miles) and the maximum speed of the tug and its tow (4 miles). Indeed, the success of such a maneuver was doubtful. So the captain decided not to face the weather and to swing to starboard at Paper Mill Point and go north on the easterly side of Tonawanda Island through the New York Central Railroad bridge (B 18C).

The two bridges are in plain sight of each other. The tug, as it passed through the barge canal bridge, blew to the Tonawanda Island bridge (B 18C) to open. Evidently those in charge of the bridge took no steps to open it. In the barge canal the tug and its tow were proceeding at slow speed—about a mile an hour. When they were in the vicinity of Paper Mill Point, 400 feet from the barge canal bridge and about 1100 feet from the Tonawanda Island bridge, the tug again blew to the New York Central Railroad bridge (B 18C) a three-blast signal for it to open.

The Tonawanda Island bridge swings on a center pan that is 22 feet 9½ inches in width. The westerly span of the bridge is,

68 feet 11 inches wide; the easterly span 69 feet, 5 inches in width. The center pan extends 85 feet to the north and 100 feet to the south of the bridge. The bridge is electrically operated from an engine house in the middle of the span. It is not equipped with any whistle to answer signals from vessels desiring to pass through the bridge.

The manner in which the bridge responds affirmatively to a tug's signal to open is by the bridge tender's activity in getting ready to open the bridge and opening it. If for any reason, such as the approach of trains or other traffic, the bridge tender does not intend to open the bridge in response to the tug's three whistles, he conveys that information to the tug by immediately waving a red flag in the day time and a red lantern at night. There are also lights on the bridge, that face red up and down the river when the bridge is closed, but show green when the bridge is open.

When the bridge is not in operation the bridge tender is in a shanty located on the Tonawanda Island side, immediately west of the westerly span. There is only one bridge tender on watch at any time. When he receives a signal from a tug for the bridge to open, he closes the gates on the fixed portion of the bridge near his shanty and sets the signals against trains. He then walks across the bridge and does the same thing at the easterly end of the bridge, after which he goes to the operating cabin in the center of the bridge and turns the lever to swing the bridge. All this takes some time—three to four minutes. To swing the bridge itself takes about a minute and a half. The captain and mate of the "Russell No. 16" had been through that bridge before.

When the captain blew the second time to the bridge, from Paper Mill Point, it probably would have been more prudent for him not to have ventured out in the current and head for the bridge until he saw the bridge begin to swing. The river current at the captain's estimate was then about four to five miles an hour. There was a 40 mile wind blowing in the same direction as the current, towards the bridge. The best the tug could do with its tow, in reverse speed, was 2 miles an hour. If the tug backed the tow for any length of time it would go to port. In approaching the bridge, with engines at slow speed so as not to lose steerage way, the tug and her

tow was travelling at the rate of 5 to 6 miles an hour over ground and would reach the bridge in about two minutes after leaving Paper Mill Point, unless the tug backed to reduce its speed. Once the tug started out in the current it could not turn back, the channel was too narrow; nor could it hold this tow against the force of the current for any great length of time, although the captain testified that at 600 feet from the bridge he could have held the tow for half to three-quarters of an hour.

When the tow was at Paper Mill Point the captain saw no traffic on the bridge. He figured the bridge would be opening. If he had been warned with a red flag or if he had seen cars going across the bridge he would have known the bridge was not going to open. In the day time machines can be seen going up or driving on the bridge. He so testified.

When about 600 feet from the bridge, the tug blew again to the bridge. The captain still believed it would open in time. He was not warned it would not. The tug and her tow continued on until within 200 feet of the center pan of the bridge before the captain concluded that the bridge would not open in time. He then deliberately beached his tow on the Tonawanda Island shore. The bow of the barge slid along on the bottom and the current and wind carried the stern of the barge around against the center pan of the bridge. The bow stopped at the Tonawanda Island abutment. After an hour and a half, by sliding the stern towards the other shore, the bow of the barge was released from the island bank and was swung by the current through the westerly half of the draw, the bridge having been opened in the meantime. The tug then picked up the barge and proceeded to the Cities Service Oil Company's dock a mile below the Tonawanda Island. The barge was damaged at the bow and towards the stern on the starboard side.

Although the tug and her tow were safe in the lee of Paper Mill Point after coming through the barge canal bridge and although the captain's first signal to the Island bridge, given 400 feet back, had not yet led to the actual opening of the bridge he was not obliged to tie up or heave to until the bridge began to swing. He saw no traffic on the bridge. That could very well be interpreted as an indication that traffic had been suspended preparatory to opening the bridge in answer to the

tug's first signal. The tug and her tow were in full view of the bridge tender.

Why was it the bridge tender did nothing to open the bridge? There is not a word of explanation from the bridge tender, John Gaul, who was then on watch, because unfortunately he died eleven days before the trial and his deposition had not been taken. However, the mate of the tug made a deposition about that time, that after the accident the bridge tender stated that he thought the tow was going in the Niagara River (around the Island) and that he did not think the tug was blowing for the bridge. Three of the bridge tenders testified that it was the custom for tugs with tows to go around the island and not through the bridge and that tugs with tows coming out of the barge canal and intending to use the bridge generally waited at Paper Mill Point, after blowing the bridge, before coming out into the river current and heading for the bridge.

But Bulletin No. 47, issued April 1938, entitled "Survey of northern and northwestern lakes", at page 413, where information is listed concerning the bridge in question, makes no mention of any custom requiring tugs and tows to wait at Paper Mill Point until the Island bridge (B 18C) opened in answer to the tug's signal. The captain of the "Russell No. 16" said he knew of no such custom.

When the tug blew three blasts to the Island bridge (B 18C), as the tug came through the barge canal, the tug and her tow were in clear view of the bridge tender of the Island bridge if he was attending to his job. The tug was proceeding at about a mile an hour, 100 feet a minute, and four minutes elapsed before the tug reached Paper Mill Point and blew to the Island bridge a second time. No signal was given by the bridge tender to the tug not to proceed. When the tug swung her tow into the Niagara River and headed for the Island bridge, there was still no warning from the bridge tender. The tug and its tow were thereafter travelling at the rate of 5 or 6 miles an hour, about 550 feet a minute, due to the current and gale, the tug just maintaining steerage with her engines. After another minute elapsed and when the tow was about 600 feet from the Island bridge, the tug blew a third signal to the bridge and received no warning in return. The tow was beached 300 feet from the bridge. The bridge tender had been signalled three times within five minutes and had done nothing.

Some argument has been made that in view of the weather it was incumbent on the tug to proceed with great caution. For the same reason there was that day more likelihood of tugs and tows going through the Island bridge, in order to avoid the difficulties or rough weather at the southwesterly end of the island, if they were to attempt to go around the island. There was also need of greater speed in opening the bridge, because the stronger current and the high wind increased the speed of the tugs and tows coming down the river. There was need for watchfulness and promptness on the part of the bridge tender.

■ The duty owed by the operator of a drawbridge to a vessel blowing for it to open and the duty of those in charge of the vessel, are well stated in several leading cases, which have been cited frequently. In Clement v. Metropolitan West Side El. Ry. Co., 7 Cir., 123 F. 271, 273, Judge Jenkins wrote: "A vessel, having given proper signal to open the bridge and prudently proceeding under slow speed, has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage. She is not bound to heave to until the bridge has been swung or raised and locked, and to critically examine the situation before proceeding (City of Chicago v. Mullen, 116 F. 292, 54 C.C.A. 94), but may carefully proceed at slow speed upon the assumption that the bridge will open in response to the signal, and may so proceed until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened (Manistee Lumber Company v. City of Chicago (D.C.) 44 F. 87; Central Railroad Company of New Jersey v. Pennsylvania Railroad Company, 59 F. 192, 8 C.C.A. 86), when it becomes the duty of the vessel, if possible, to stop, and, if necessary, to go astern."

■ Judge Warrington wrote in Great Lakes Towing Co. v. Masaba S. S. Co., 6 Cir., 237 F. 577, at page 579: "It results that upon receiving or being reasonably chargeable with notice of the approach of a vessel, failure either promptly to open the draw or the lift of a bridge maintained across such a river as this, or, if the facts justify, seasonably to notify the approaching vessel that failure to open or delay in

doing so is unavoidable, raises a presumption of negligence which the owner or operator of the bridge must overcome." Citing cases.

It has been argued that the tug or the tow should have anchored when 600 feet away, the bridge having failed to answer the tug's signal. The testimony shows that there was not time to do this and that it would have been dangerous to anchor in that current.

In The Charles Mulford, D.C., 257 F. 131, 133, Judge A. N. Hand wrote: "I find that the Ganoga received no answering signal from the drawbridge. I further find that it did not open promptly, and that the predicament in which the tug and tow found themselves was due to the negligence of the persons in charge of the bridge in failing to hear or reply to signals. Under these circumstances the Ganoga was justified in attempting to turn her tow, and she cannot be said to have turned it in a negligent manner, in view of the narrowness of the channel. I do not think the Genesee could have held back the tow in any way, except by a hawser attached to the outer and inner rear barges, which there was apparently no opportunity to affix. I do not think, therefore, there was negligence in failing to do this."

Judge Manton refers to some of the more important decisions in his opinion in Newtown Creek Towing Co. v. City of New York, 2 Cir., 47 F.2d 883, from which the following is quoted (see page 884):

"On this testimony it is clear that the bridge tender was fully conversant of the condition of the tug and her tow, and he opened the bridge negligently, in the wrong direction, striking the barge and causing the damage. But it is claimed that the master of the tug was at fault in proceeding as he did up the creek before the bridge opened. Notwithstanding this fault, if the bridge tender by the exercise of ordinary care could have avoided the collision by turning the bridge away from the tug, embarrassed as she was, the city would be liable. The Portia, 64 F. 811 (C.C.A. 2); The Richmond, 63 F. 1020 (C.C.A. 2);

The Red Eagle, 3 F.2d 541 (C.C.A. 2); The El Monte, 252 F. 59 (C.C.A. 5).

"In Munroe v. City of Chicago, 194 F. 936 (C.C.A. 7), it was held that a vessel having duly signaled for a draw may properly proceed at slow speed on the assumption that the bridge will open, until it appears by proper warning or reasonable view of the situation that it will not. And this court, in Conklin v. City of Norwalk, 270 F. 68, approved that ruling. In Great Lakes Towing Co. v. Masaba S. S. Co., 237 F. 577 (C.C.A. 6), where a collision occurred with a bridge while lifting, the court pointed out that a failure either to promptly open the draw of, or lift, the bridge maintained across a river, if there was reasonable notice by the approaching vessel, raised a presumption of negligence which the owner or operator of the bridge must overcome. And where the signal has been received of the desire to open the bridge over a navigable stream and no warning is given that the draw will not open in time, it has been held an invitation is presented to a tug to proceed. City of Chicago v. Mullen, 116 F. 292 (C.C.A. 7); Clement v. Metropolitan, etc., Ry. Co., 123 F. 271 (C.C.A. 7); The Charles Mulford, 257 F. 131 (D.C.S.D.N.Y.); O'Keefe v. Staples Coal Co., 201 F. 135 (D.C.Mass.)."

As between the libellant, owner of the barge, and the claimant, owner of the tug, the barge having stranded while in tow, the tug, prima facie, was negligent and claimant had the burden of showing that the grounding and damage were not due to the tug's negligence. The Reichert Line, 2 Cir., 64 F.2d 13. I find that the claimant has sustained that burden and that it has been shown that the fault of the respondent, New York Central Railroad Co., was the proximate cause of the damage to the libellant's barge.

A decree should be entered dismissing the libel against the tug and holding the respondent railroad solely liable to libellant for its damages. A Commissioner will be named to fix the amount of the damage. This opinion contains the Court's findings of fact and conclusions of law. Submit decree on notice.