SOUTHERN TRANSP. CO. v. CITY OF NEW YORK.

THE BANGO.

THE RAYMOND CARD.

THE GUIDING STAR.

United States District Court
S. D. New York.
June 13, 1950.

Nelson, Healy, Baillie & Burke, New York City (Allan A. Baillie, New York City, of counsel), for libelant.

John P. McGrath, Corp. Counsel, New York City (Edwin M. Bourke, New York City, of counsel), for City of New York.

Foley & Martin, New York City, for claimant Card Towing Line, Inc.

William M. Smith, New York City (Christopher E. Heckman, William J. O'Brien, III, New York City, of counsel), for claimant McAllister Bros., Inc.

LEIBELL, District Judge.

On June 19, 1947 the Southern Transportation Company, as owner of the barge Bango, filed an amended libel in this Court against the City of New York, as owner and operator of a bridge spanning Newtown Creek, a navigable stream, and against the steamtugs Raymond Card and Guiding Star, owned respectively by the Card Towing Line and McAllister Bros., Inc. The Bango, while in tow of the tugs Raymond Card and Guiding Star, struck the abutment or pier of the bridge which spans the Creek at Greenpoint Avenue, between the County of Kings and the County of Queens. The libel alleges that the operator of the bridge was negligent in failing to open the bridge promptly upon timely signal; that the steamtug Raymond Card was operated at an excessive speed and negligently lost control of its tow, and maneuvered the barge Bango in such a negligent manner as to cause it to sheer into the bridge abutment; and a similar charge of negligence is alleged against the tug Guiding Star.

The barge Bango is a wooden sea-going barge, with a pointed or sharp bow, approximately 276 feet long, 46 feet in beam, having a draft of 23 feet. The top of her pole or mast extends about 65 feet above the water line. The barge has no motive power but is equipped with a wheel and rudder for steering purposes and carries a crew of four. She was laden with a full cargo of coal, taken on at Norfolk, Virginia, and was bound for the Brooklyn Union Gas Company plant on Newtown Creek, New York City. At about 1:45 P. M. November 12, 1945, she entered Newtown Creek, in tow of the steamtugs Raymond Card and Guiding Star, having proceeded from Red Hook Flats, Brooklyn, where she had been anchored. The tug Raymond Card was made fast to the port quarter of the Bango by three lines, a towing line running from the stern of the Raymond Card, a headline and a backing line. The Raymond Card was a steamtug having 750 to 850 horse power and was in charge of the towing operation. The tug Guiding Star was made fast to the port bow of the Bango by a single line and her function was to assist the Raymond Card in maneuvering the Bango as directed by the Master of the Raymond Card, and from her position at the bow to check or influence the heading of the tow.

Newtown Creek follows a winding course and runs easterly between Queens and Kings Counties. Its mouth is at the East River. It is about 250 to 300 feet wide and about 28 feet in depth at flood tide. After entering the Creek, the tow proceeded through the Vernon Avenue bridge, the first of four vehicular bridges which span the creek and which opened for the tow's passage upon signal by the Raymond Card.

The tow continued easterly in Newtown Creek for a distance of about 2600 feet, moving at about 2½ to 3 knots with a flood tide or current of ½ to ¾ of a knot underfoot, until it was abreast of the mouth of Whale Creek, which is about 2100 feet from the Greenpoint Avenue bridge. At about this point in Newtown Creek the Greenpoint Avenue bridge could not be seen

from the tow except for occasional glimpses between buildings on the shore line. At this time the tug Raymond Card sounded a three blast whistle signal signifying a request to open the Greenpoint Avenue bridge. No reply signal was given by those in charge of the bridge. The City contends that the bridge tenders did not hear the signal given at Whale Creek and that may be so. However, the testimony of the Bango's captain and of the Master of another tug, the Socony No. 17, which was following the Card tow, shows that a three blast signal was first sounded at this time.

The tow continued its passage in Newtown Creek for about another 900 feet when it reached a sharp bend or curve in the Creek, turning to starboard toward and about 1300 feet away from the Greenpoint Avenue bridge. At this point the bridge could be seen from the tow and it was observed by the Masters of the Raymond Card, the Guiding Star and the Bango to be closed and a second three blast signal was sounded by the Card. This signal, at a distance of 1300 feet should have been heard by those in charge of the bridge. The evidence shows conclusively that it was sounded. After sounding this second signal and having received no reply from the bridge and the bridge not having been opened, the Master of the Card ordered the barge Bango to have a man stand by the barge's bow anchor. At this point the Master of the Guiding Star observed that traffic was still going across the bridge.

In order to make the turn at this point in the Creek and conform the course or track of its heavy tow to the contour of the bend, it was necessary for the tug Raymond Card to increase its speed to full in going around the bend. The Raymond Card did increase its speed to full and navigated the bend, covering a distance of about 500 or 600 feet in coming around the bend and straightening out for the approach to the Greenpoint Avenue bridge. After rounding the bend the speed of the Raymond Card's engines was reduced to slow (one bell) or about 2½ knots. The flotilla still had on some headway gained by the full speed maneuver executed in going around the bend. The Master of the Card, as well as those aboard the Bango, Guiding Star and the following tug, the Socony No. 17, saw that the Greenpoint Avenue bridge was still closed and that traffic was still moving across the bridge.

The Card, then about 700 feet from the bridge, sounded a third three blast signal to the bridge. This signal admittedly was heard by the bridge operator who testified that the bridge then sounded a two blast signal on an electric horn which would be audible from 800 feet to a half of a mile distant. The bridge operator testified that the purpose of that signal was to notify the tug that its signal had been heard and that the bridge was being prepared to open. Such a signal from the bridge would be contrary to the custom and usage on Newtown Creek, where no such signal is given for this purpose by the bridge; it would also be contrary to regulations of the War Department for the Vernon Avenue bridge, which require a three blast signal to indicate that the bridge can be opened immediately and a two blast signal to indicate that the bridge cannot be opened. Andersen, Master of the tug Socony No. 17 and Robinson, captain of the barge Bango, and no longer employed by libelant company were both within audible range of the horn and did not hear it. It also appears from the testimony of the Master of the Guiding Star, with similar corroborative testimony in the record by the Master of the Socony No. 17, that vehicular and passenger traffic was still going over the bridge when a fourth three blast signal was sounded by the Card, when the Bango had approached to within 500 feet of the bridge.

Less than a minute after this fourth three blast signal and while the barge Bango was in midstream, about 300 or 400 feet from the bridge, the Master of the tug Card sounded a danger signal and stopped his engines, but the flotilla continued to proceed toward the bridge at a slow rate of speed. A short time later when the Bango was between 100 and 200 feet (less than the barge's length) away from the bridge the Raymond Card reversed its engines and ordered the Bango's captain to have the bow anchor of the Bango let go. This order

was promptly executed by the Bango. The effect of reversing the Raymond Card's engines was to cause the bow of the Bango to swing to port. The Master of the Raymond Card ordered the Guiding Star to go full speed ahead to offset the port movement of the Bango's bow. This order was executed but before the Guiding Star could check the "Bango's" port swing it had to cut loose and back out, because the port swing of the Bango had carried the bow so close to the eastern abutment of the bridge that the Guiding Star was in danger of being crushed between the Bango and the bridge. The Bango continued its port swing and came into collision with the eastern or Queen's side abutment of the Greenpoint Avenue bridge. The leaves of the bridge began to open upwards just prior to the time the Bango struck the abutment. This was about 2:25 P.M.

At the time of the collision the Greenpoint Avenue bridge machinery was in good order and condition. The bridge was a bascule type bridge constructed with two leaves or draws, each 125 feet in width reaching out from the easterly and westerly abutments and meeting in the center above midstream. Both of the leaves opened simultaneously for a distance of 10 feet and after that either one or both can be raised higher. The horizontal clearance when the bridge is fully opened is 149.9 feet and the vertical clearance when closed is 27.7 feet at mean high water.

The above facts and circumstances surrounding the collision at issue fix responsibility for the occurrence on the operator of the bridge and upon the Master of the Card, in charge of the flotilla.

A bridge spanning a navigable body of water has always been considered an obstruction to navigation and those in charge of the bridge have the duty to open promptly upon signal from a vessel desiring passage, or in the alternative, to warn the vessel promptly that the bridge cannot be opened. Clement v. Metropolitan West Side El. Ry. Co., 7 Cir., 1903, 123 F. 271; Great Lakes Towing Co. v. Masaba S. S. Co., 6 Cir., 1916, 237 F. 577; The Charles Mulford, D.C.S.D.N.Y. 1916, 257 F. 131. City of Cleveland v. Mc-Iver, 6 Cir., 1940, 109 F.2d 69; The Russell No. 16, D.C.S.D.N.Y. 1938, 25 F.Supp. 1013. The duty of the operator of the bridge was well stated in the frequently cited Clement v. Metropolitan West Side El. Ry. Co., supra, 123 F. 273, where the Court held: "A bridge spanning a navigable river is an obstruction to navigation tolerated because of necessity and convenience to commerce upon land. Such a structure must be so maintained and operated that navigation may not be impeded more than is absolutely necessary, the right of navigation being paramount. It is incumbent upon the owner that the bridge be so constructed that it may be readily opened to admit the passage of craft, and maintained in suitable condition thereto."

In Great Lakes Towing Co. v. Masaba S. S. Co., supra, 237 F. 579 the rule was stated: "It results that upon receiving or being reasonably chargeable with notice of the approach of a vessel, failure either promptly to open the draw or the lift of a bridge maintained across such a river as this, or if the facts justify, seasonably to notify the approaching vessel that failure to open or delay in doing so is unavoidable, raises a presumption of negligence which the owner or operator of the bridge must overcome."

Statutory provisions in respect to bridges set forth the same standards. Section 494 of Title 33 U.S.C.A. provides in part: "If the bridge shall be constructed with a draw, then the draw shall be opened promptly by the persons owning or operating such bridge upon reasonable signal for the passage of boats and other water craft."

Further, the War Department on May 31, 1932, pursuant to Section 499 of Title 33, U.S.C.A., promulgated Regulations for the opening of the drawbridge across Newtown Creek, at Vernon Avenue, Long Island City, N. Y. These Regulations provided:

"1. The draw shall be opened promptly upon signal, for the passage of all vessels unable to pass under the closed bridge, * * *.

"2. Whenever a vessel unable to pass under the closed bridge approaches it, the

signal of a desire for the draw to be opened shall be three blasts of a whistle or horn blown on the vessel. This signal shall be repeated at intervals until it is answered from the bridge. Upon receiving the signal from the vessel, the tender or operator of the bridge, in case the draw can be opened immediately, shall reply by three blasts of a whistle or horn, or by three loud and distinct strokes of a bell. In case of accident to the machinery, or other contingency, necessitating delay in opening the draw, the signal from the vessel shall be answered by the tender or operator of the bridge by two blasts of a whistle or horn, or by two loud and distinct strokes of a bell."

The City of New York contends that these Regulations and the signal officially prescribed therein for the Vernon Avenue bridge were adopted and in use on the Greenpoint Avenue bridge.

The record shows that the Card began sounding the required three blast signal signifying a request to open the bridge while the flotilla was still 2100 feet from the bridge. The same signal was repeated by the Card again at 1300 feet, 700 feet and 500 feet. The operator of the bridge must have heard the signal given at 1300 feet. That was in sufficient time for him to open the bridge. Despite this fact the operator of the bridge continued to permit vehicular and pedestrian traffic, not of an urgent or emergency nature, to cross this small 250 foot span. He failed to open the bridge promptly and failed to give the vessels any warning that the bridge would not open. The record is bare of any satisfactory explanation of this delay. The bridge was in good operating condition; it usually required only about two minutes to clear the traffic and raise the leaves of the bridge; and no emergency traffic delayed the opening operation. The City has failed to overcome the presumption of negligence which such facts create. In these circumstances the failure to open the bridge promptly was a fault contributing to the collision.

The fault of the tug Raymond Card lies in the fact that it continued to move the flotilla forward, towards the bridge, without reversing or slowing its speed or headway when, "in a reasonable view of the situation" it was apparent that the bridge was not opening and a dangerous situation was being created. In Clement v. Metropolitan West Side El. Railway Co., 123 F. 271, 273, the Court said: "A vessel, having given proper signal to open the bridge and prudently proceeding under slow speed, has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage. She is not bound to heave to until the bridge has been swung or raised and locked, and to critically examine the situation before proceeding, City of Chicago v. Mullen, 7 Cir., 54 C.C.A. 94, 116 F. 292, but may carefully proceed at slow speed upon the assumption that the bridge will open in response to the signal, and may so proceed until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened. Manistee Lumber Co. v. City of Chicago, D.C., 44 F. 87; Central Railroad Co. of New Jersey v. Pennsylvania Railroad Co., [2 Cir.,] 8 C.C.A. 86, 59 F. 192, when it becomes the duty of the vessel, if possible, to stop, and, if necessary, to go astern."

When the Card brought its flotilla around the curve or bend in Newtown Creek under full speed, it sounded its second three blast signal. At 700 feet and 500 feet when the third and fourth three blast signals were sounded the bridge was still closed and it was apparent that traffic was still crossing the bridge. Yet the Card, with a large heavy, coal laden, seagoing barge in tow, too large to turn in the creek, continued with headway at slow speed and did not back its engines until the barge was between 100 and 200 feet away from the bridge. It must have been apparent to the Master of the Card that a dangerous situation was developing some time before that, because he himself ordered the Bango to stand by her anchor while still 1300 feet from the bridge. If the Card had reversed her engines sooner, when she blew her third or fourth signal, she would have slowed the flotilla down. Of course the bow of the Bango would have swung to

port but there then would have been ample time and room for the tug Guiding Star to check the Bango's swing to port and if the anchor of the Bango had been let go sooner that too would have checked the forward movement of the barge and the collision would have been avoided. I do not give any weight to the statement of the Card's captain that if he had done those things, the Bango would have swung across the creek and blocked the creek. If that were true then the Bango should not have been towed into Newtown Creek. The bridge, even though not promptly opened and placing the Card in an embarrassing position, would however have been opened before the flotilla had reached the bridge and the collision would not have occurred.

The faults of the bridge operator and of the Master of the Raymond Card were both contributing causes of the collision. New England Fuel & Transportation Co. v. City of Boston, D.C., 257 F. 778. The record reveals no fault on the part of the tug Guiding Star or the barge Bango. An interlocutory decree should be entered dismissing the libel against the Guiding Star and its owners, McAllister Brothers Inc. and holding the tug Raymond Card and its owner, Card Towing Line, Inc. and The City of New York jointly liable to the libelant, Southern Transportation Company, for the damage to its barge Bango. A provision for the appointment of a Commissioner to assess the damages may be included in the interlocutory decree.