NEW ENGLAND FUEL & TRANSPORTATION CO. v. CITY OF BOSTON.

(District Court, D. Massachusetts. April 30, 1919.)

No. 1668.

1. NAVIGABLE WATERS ⬤⟿20(8)—INJURY TO VESSEL FROM COLLISION WITH BRIDGE—NEGLIGENT OPERATION OF DRAW.

A city, as operator of a drawbridge, and a steamer, both *held* in fault and liable for injury to a tug assisting the steamer through; the steamer because of negligent operation of her engines contrary to signal, causing her to move ahead and strike the swinging draw, and the city because the bridgetender negligently allowed the draw to overswing and strike the tug.

2. NEGLIGENCE ⬤⟿61(2)—PROXIMATE CAUSE OF INJURY—CONCURRENT CAUSES.

That one person's negligence created a condition of things in which the later independent negligent act of another sets in motion causes which occasion an accident is not sufficient to hold the first person responsible; but, if the effect of his negligence continues into the accident, he is also responsible.

In Admiralty. Suit by the New England Fuel & Transportation Company, owner of the tug Juno, against the City of Boston, with the steamer Currier, the Gulf Refining Company, claimant, impleaded. Decree for libelant against both respondents.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for libelant.

James L. Gillingham, of New York City, for respondent Gulf Refining Co.

Joseph P. Lyons, of Boston, Mass., for respondent city of Boston.

MORTON, District Judge. The Currier, which is a large steamer (370 feet long, 52 feet beam, 20 feet draft at the time in question, and properly manned and equipped), came out of the Everett Gas Works dock in the Mystic river about 7:30 a. m. on September 11,

1917, with the tugs Saturn and Juno in attendance. By their aid she was headed towards the Chelsea north drawbridge. Her engine was put half speed ahead and ran so for about three minutes, when it was stopped. When about 2,000 feet from the bridge, she gave the regulation signal for the draw, four long blasts. Near the lower red buoy, the bridge having given no sign of opening, the signal to it was repeated. The bridge shortly after answered the Currier's signal in such a way as to give her to understand that it would open. After this answering signal had been given, however, highway traffic was observed still crossing the draw. It continued to do so until the steamer, which was sliding forward with her engine stopped, had got so near the bridge as to make it doubtful whether the draw would be open by the time she reached it. A danger signal was then blown by the steamer for the purpose of warning and hurrying up the drawtenders.

When the steamer was 800 or 1,000 feet away from the bridge, the order was given to start her engines slow astern. This order was properly repeated back from her engineroom. According to her engineroom log, however, it was executed as slow speed ahead. After a short, but appreciable, interval, it was noticed by those in charge of her that her headway was not being checked as was expected. By this time she was so near the bridge and moving at such a speed that there was obvious danger of an accident. The order was then given full speed astern and was executed. By the time the backwater from the propeller had become noticeable around the Juno, the attention of everybody was directed toward the impending collision with the bridge. This accounts for the failure of the men on the Juno to notice the backwater, and for their testimony—which I think mistaken—that the steamer's engines were not running astern before the accident.

The draw is 362 feet long and weighs about 1,400 tons. It revolves on its center. It got in motion slowly at first, turning from the steamer. After it had swung 8 or 10 feet, the steamer overtook it and collided with it, crushing in the outer stringer and damaging one of the heavier members farther inside. The draw continued to open, and drew away from the steamer, which advanced through the opening. The Juno at this time was on the steamer's port quarter in the draw opening, between her and the draw pier of the bridge. The draw revolved until it came to its middle, or full-open, position. At that point it ought to have stopped, but it did not do so. It continued to revolve, and its left end—the one not struck by the Currier—overswung and crushed the Juno against the side of the Currier, inflicting serious injuries on the Juno, to recover for which this libel is brought. The Currier kept on through the draw, and the Juno also. This is the account of the accident given on behalf of the Juno and Currier. In its main outlines it is not disputed, and I find the facts as above stated.

Nobody contends that the Juno was at fault, and it is plain that she was not. As between her and the Currier, the only allegation of fault on the part of the latter, which requires discussion, is that the Currier's

engines were not properly handled. The orders to the engineroom seem to have been right, and, indeed, are not criticized; but other facts besides the entry on the engineroom log indicate that a mistake was made there, and that the engines were sent ahead, when the order was to send them astern. In close quarters such a blunder might easily cause a collision; and it did so in this case. If the engines had been handled in accordance with the orders, the steamer would have been checked before she collided with the bridge. I find that there was negligence in handling the Currier's engines, which, in conjunction with the negligent delay in opening the draw, hereafter referred to, caused the collision between the Currier and the draw.

Turning to the occurrences on the draw: Its crew were not at their posts when the first signal was given by the Currier. Nobody was on watch in the tower or on the bridge proper. All the men were down in the house on the pier, on the opposite side from the Currier, changing their clothes and getting ready to go off duty at 8 o'clock. They were not aware of the Currier's signal until their attention was called to it by Capt. Ford of the tug Sprague, which was tied up at a nearby pier. Capt. Ford heard the Currier's signals and noticed that they were not being heeded by the draw crew, and he called the attention of the draw crew to them. Even after this was done, the draw tenders did not go about their work sharply, as they ought to have done. There was delay in excluding the traffic, a delay which, as the accident could have been avoided, if the draw had started to open but a short time sooner than it did, directly entered into the accident. It is clear that there were serious faults on the part of the draw crew in not being at their post of duty, in not observing the signals of the Currier, and in failing to exclude traffic and open the draw promptly, as the regulations require. Rules and Regulations to Govern the Opening of Bridges Crossing Boston Harbor, Made by Secretary of War, rules 7, 8, and 10; River and Harbor Act Aug. 18, 1894, c. 299, § 5, 28 Stat. 362 (Comp. St. § 9973). Testimony by men whose fault is of such gross and obvious character, given in attempted exculpation of their conduct, does not carry conviction when contradicted; and I accept in the main the story as to the movement and conduct of the draw as given on behalf of the Currier and the Juno.

[1] The next question is whether, after the collision, the draw could have been checked in time to prevent the overswing which caused the accident. Doherty, who was handling the machinery, testifies that as soon as the collision occurred he shut off the power and applied the brakes on the draw, and that it swung from that time on under the full braking power, which was insufficient to stop it before the accident. From the nature of the case, no direct evidence can be given in contradiction of his assertion; but I think that the facts show that he is in error. The normal speed of the draw in opening is, I am satisfied, much greater than the speed at which the Currier struck it. Assuming, as Mr. Gardner suggests, I think, rightly, that the spring in the steel in the draw under the blow of the vessel would impart to it a speed somewhat greater than the speed of the vessel herself, nevertheless I am satisfied that, considering the long distance

which the draw swung thereafter, it is very improbable that such a speed was communicated to it as put it out of control by the brakes. After the Currier collided with it, she was still going ahead. I think that Doherty continued the power to keep the bridge swinging ahead of her, and in the excitement of the accident neglected to shut it off and apply the brakes in time to prevent the overswing; and I so find. It is contended for the Juno that the mechanism of the draw was defective; but I do not think that such finding ought to be made on the evidence before the court.

[2] Negligence on the part of the city, which caused the accident, is clearly established. It remains only to consider whether the Currier's negligence so contributed thereto as to make her also responsible. A party is not responsible for his negligence, unless the effect of it continues into the accident. That one person's negligence created a condition of things in which the later independent negligent act of another person sets in motion causes which occasion an accident is not sufficient to justify holding the first person responsible. So, where a dealer negligently sold gunpowder to a small boy, who took it home and kept it there with the knowledge of his guardian, and was later permitted by his guardian to have it again, it was held that the dealer was not responsible for the resulting accident. Davidson v. Nichols, 11 Allen (Mass.) 514. But the fact that the course of the defendant's negligence is so diverted by the act of a second person—even a negligent act— as to result in injury to the plaintiff, does not exonerate the defendant, if there was a continuing causal connection between what the defendant did and the injury. In Eaton v. B. & L. R. R. Co., 11 Allen, 500 (Mass.) 87 Am. Dec. 730, the train of the defendant, in which the plaintiff was a passenger when injured, came to a stop between stations. There was a rear-end collision with a following train, operated by another railroad using the same tracks. The collision might have been avoided by due care in handling the overtaking train. The defendant was, however, held liable, on the ground that its negligence contributed to the accident.

The immediate cause of the present accident was the fact that the drawtender mishandled the draw. He did so because he was upset (mentally) by the collision between the Currier and the draw, and her continuing ahead after the collision had taken place. As above stated, his attention was focused solely on getting the draw out of her way, until too late to prevent the overswing, which did the damage. As between the Currier and the city, it may be that the latter—equitably at least—should stand the loss; but, as between the Currier and the Juno, I think that the former's negligence so continued into the accident as to make her responsible for it.

A decree may be entered in favor of the libelant against both the city of Boston and the Gulf Refining Company, and the case referred to an assessor to state the damages.